IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

EPOS TECHNOLOGIES LTD.,

Plaintiff,

v.

PEGASUS TECHNOLOGIES LTD.,

Defendant.

Case No.    07-cv-00416 (RWR)

**PLAINTIFF EPOS TECHNOLOGIES LTD.'S OPPOSITION TO
DEFENDANT PEGASUS TECHNOLOGIES LTD.'S MOTION TO DISMISS
OR, IN THE ALTERNATIVE, FOR A MORE DEFINITE STATEMENT**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................. 1

II.    BACKGROUND ................................................................................................... 3

    A.    EPOS and Its Digital Pen. ....................................................................... 3

    B.    The Entry of the EPOS Pen into the U.S. Market ................................... 3

    C.    Pegasus's Threats and Allegations .......................................................... 4

    D.    Pegasus's Examinations of the EPOS Pen ............................................. 5

    E.    The Difference Between EPOS's and Pegasus's Technologies ............... 5

III.    ARGUMENT ........................................................................................................ 6

    A.    Pegasus's Motion to Dismiss for Lack of Subject-Matter Jurisdiction
           Should Be Denied Because There Is an Actual, Ripe Controversy Between
           the Parties ............................................................................................... 6

           1.    An Actual Controversy Exists Because EPOS Is Suffering An
                 Actual Injury Caused by Pegasus that Can Be Redressed by
                 Judicial Relief and that Is of Sufficient Immediacy and Reality to
                 Warrant the Issuance of a Declaratory Judgment ....................... 6

           2.    Pegasus's Arguments for Lack of Subject-Matter Jurisdiction Are
                 Legally Flawed and Factually Disproved ................................... 8

           3.    Pegasus's References to Issues of Personal Jurisdiction Are
                 Inapposite ................................................................................... 9

    B.    Pegasus's Motion to Dismiss for Failure to State a Claim Should Be
           Denied ................................................................................................... 10

           1.    Because a Pleading Need Only Provide Fair Notice, Not Specific
                 Facts, a Rule 12(b)(6) Motion Is Disfavored and Seldom Granted ........ 10

           2.    EPOS's Complaint Sets Forth Allegations Entitling It to Relief ............. 10

           3.    Pegasus's Argument for Failure to State a Claim Once Again
                 Ignores the Law and the Reality of Its Own Role in Defining the
                 Accused Product ......................................................................... 11

    C.    Pegasus's Motion for a More Definite Statement Should Be Denied
           Because the Details Sought Are Obtainable Through Discovery, and
           Pegasus Can Respond to the Allegations without Prejudicing Itself ................. 12

    D.    Denial of EPOS's Request for Declaratory Relief Would Allow Pegasus to
           Continue its Campaign of Threats and Unfounded Accusations .......................... 13

IV.    CONCLUSION ................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Auster Oil & Gas, Inc. v. Stream,*
  764 F.2d 381 (5th Cir. 1985) ...................................................................................................10

*Beery v. Hitachi Home Elecs. (Am.), Inc.,*
  157 F.R.D. 477 (C.D. Cal. 1993)..............................................................................................13

*Cellars v. Pacific Coast Packaging, Inc.,*
  189 F.R.D. 575 (N.D. Cal. 1999)....................................................................................10, 12, 13

*Cook v. Winfrey,*
  141 F.3d 322 (7th Cir. 1998) .....................................................................................................9

*Erickson v. Pardus,*
  551 U.S. ___, 127 S. Ct. 2197 (2007).............................................................................9, 10, 11, 13

*Gilligan v. Jamco Dev. Corp.,*
  108 F.3d 246 (9th Cir. 1997) ...............................................................................................10, 13

*Gould Elecs., Inc. v. United States,*
  220 F.3d 169 (3d Cir. 2000) ......................................................................................................8

*Gustave-Schmidt v. Chao,*
  226 F. Supp. 2d 191 (D.D.C. 2002)..........................................................................................11

*Hartford Fire Ins. Co. v. Socialist People's Libyan Arab Jamahiriya,*
  No. 98-3096 (TFH), 1999 U.S. Dist. LEXIS 15035 (D.D.C. Sept. 22, 1999).............................12, 13

*Johnson v. United States,*
  735 F. Supp. 1 (D.D.C. 1990) ..................................................................................................10

*Judkins v. HT Window Fashions Corp.,*
  No. 07-0251, 2007 U.S. Dist. LEXIS 42468 (W.D. Pa. June 8, 2007) ...........................................8

*Loss v. Blankenship,*
  673 F.3d 942 (7th Cir. 1982) ......................................................................................................9

*MedImmune, Inc. v. Genentech, Inc.,*
  549 U.S. ___, 127 S. Ct. 764 (2007)...................................................................................6, 7, 8

*Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.,*
  482 F.3d at 1338 ....................................................................................................................7

*Thomas v. Principi,*
  394 F.3d 970 (D.C. Cir. 2005).............................................................................................10, 11

*Towers Tenant Ass'n v. Towers Ltd. P'ship,*
  563 F. Supp. 566 (D.D.C. 1983).........................................................................................12, 13

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Warren v. District of Columbia,*
   353 F.3d 36 (D.C. Cir. 2004)......................................................................10, 11

**STATUTES**

35 U.S.C. §§ 1 et seq..............................................................................................9

35 U.S.C. § 102....................................................................................................11

35 U.S.C. § 103....................................................................................................11

35 U.S.C. § 112....................................................................................................11

35 U.S.C. § 271.................................................................................................9, 11

35 U.S.C. 271(a)......................................................................................................2

35 U.S.C. § 293......................................................................................................9

28 U.S.C. § 1338(a)................................................................................................9

28 U.S.C. § 2201.................................................................................................9, 11

28 U.S.C. § 2202.................................................................................................9, 11

Fed. R. Civ. P. 8(a)(2)........................................................................................9, 10

Fed. R. Civ. P. 12(b)(1)..........................................................................................8

Fed. R. Civ. P. 12(b)(6).................................................................................10, 11, 12

Fed. R. Civ. P. 12(e) ..............................................................................................12

Plaintiff EPOS Technologies Ltd. ("EPOS") hereby respectfully submits its opposition to Defendant Pegasus Technologies Ltd.'s Motion to Dismiss or, in the Alternative, for a More Definite Statement.

## I.     INTRODUCTION

Defendant Pegasus Technologies Ltd. ("Pegasus") has repeatedly stated to EPOS's investors, customers and potential joint venture partners, and directly to EPOS itself, that EPOS is infringing Pegasus's U.S. patents.  EPOS, which is on the verge of having the first large production of its products sold in the United States, has already suffered serious harm as a result of these allegations.  Instead of being able to market and distribute its products freely, EPOS must explain to its investors and business partners that it does not believe that it infringes any of Pegasus's patents.  Pegasus's allegations have interfered with EPOS's business opportunities.  For Pegasus to turn around now and declare to this Court that this action should be dismissed because "there is presently no actual case or controversy between the parties sufficient to give rise to jurisdiction" is disingenuous in light of Pegasus's conduct.

As set forth in EPOS's Complaint, Pegasus sent a December 31, 2006 letter to EPOS *and several of its investors* asserting that EPOS infringes, demanding that EPOS "forbear from making, using and/or selling the infringing product," and stating that "Pegasus is determined to vigorously enforce its intellectual property and will weigh all its legal options."  This letter alone establishes the existence of an actual case or controversy between the parties—and EPOS is suffering harm as a result.

The December 31, 2006 letter also refutes Pegasus's purported ignorance of the products at issue.  Pegasus's letter accuses EPOS's "*ultrasonic digital pen product*" of infringing.  EPOS currently offers for sale only two products, and the "*ultrasonic digital pen*" that was identified in Pegasus's letter is common to both of those products.  Pegasus clearly knew what device it had in mind when it sent its letter.  Indeed, given the technical and marketing materials available on EPOS's website, the numerous interviews that EPOS's Chief Executive Officer has given to

-1-

print, television, and internet media, and Pegasus's monitoring of EPOS's customers' booths at trade shows at which the EPOS pen has been displayed and demonstrated, the suggestion that Pegasus is somehow unaware of which product is at issue is implausible.

Moreover, Pegasus's assertion that the Court should dismiss this action because EPOS is merely seeking an "advisory opinion" lacks any factual basis. Pegasus's motion conveniently overlooks the fact that EPOS's conduct already falls within the definition of an "offer to sell" under 35 U.S.C. 271(a), thereby potentially exposing EPOS to alleged infringement liability. In addition, EPOS has given many demonstrations of its pen in the United States that constitute "use" of the allegedly infringing pen. As a result of Pegasus's threats to EPOS, its allegations to EPOS's investors, customers and business partners, the harm that Pegasus is already causing to EPOS's business, and the fact that EPOS has already used and made offers to sell the accused pen in the United States, there is no question that an actual controversy requiring judicial relief is pending here. Thus, this case satisfies the definition of "case" or "controversy" and is properly suited for declaratory relief.

Pegasus's assertion that the Complaint fails to state a claim is plainly without merit. The Complaint provides Pegasus ample notice of the claims and the grounds upon which they rest. Equally baseless is Pegasus's motion for a more definite statement. To the extent that Pegasus seeks any additional information not contained in the Complaint, it can be obtained through discovery.

Dismissal of this case under these circumstances would not be justifiable, and would allow Pegasus to continue its campaign to malign EPOS through direct and indirect allegations and threats. EPOS will continue to be harmed as a result of Pegasus's actions until this matter is resolved. The kind of harm occurring here is precisely the kind of harm that the Declaratory Judgment Act was meant to prevent.

Accordingly, Pegasus's motion should be denied in its entirety.

## II.    BACKGROUND

### A.    EPOS and Its Digital Pen.

EPOS Technologies Ltd. was formed in 2003. (*See* Turbahn Decl. ¶ 2.[1]) Since its inception, EPOS has worked to develop advanced digital positioning technology. (*See id.*) Recently, EPOS has developed the following products: (1) a wireless digital pen and mouse and (2) a wireless digital pen and USB flash drive that plugs into a computer. (*Id.* ¶¶ 3-4; Exh. A.) The pens allow students, businesspeople, professionals and other users to take notes of lectures or meetings on ordinary paper, and then have those notes appear in handwritten or typewritten form on their laptop or desktop computers. (*Id.* ¶ 3.)

Both of the above-described products use the same digital pen. (Turbahn Decl. ¶ 5.) The pen works with two different receivers. (*Id.*) In one product, the receiver is connected directly to a computer during use. (*Id.*) In the other, a USB flash drive stores the data from the movement of the pen during use, and then, when later plugged into a computer, the data in the flash drive is transferred onto the computer. (*Id.* ¶¶ 4-5; Exh. A.)

### B.    The Entry of the EPOS Pen into the U.S. Market.

Since last year, EPOS has been preparing the U.S. market for its pen. (*See* Turbahn Decl. ¶¶ 10-18.) In January 2007, four EPOS employees traveled to the Computer Electronics Show in Las Vegas, Nevada, where they demonstrated the pen. (*See id.* ¶ 11.) Two of EPOS's customers also demonstrated the pen at their booths during that show. (*Id.*) The chief executive officer of EPOS, Oded Turbahn, demonstrated the pen over thirty times on that trip alone. (*Id.*) In all, EPOS employees have made approximately ten trips to the United States to market the pen. (*Id.* ¶ 14.) Furthermore, EPOS has handed out around ninety sample pens in the United States. (*See id.* ¶ 13.)

---

[1] The abbreviation "Turbahn Decl." refers to the Declaration of Oded Turbahn in Opposition to Defendant Pegasus Technologies Ltd.'s Motion to Dismiss or, in the Alternative, For a More Definite Statement, filed concurrently herewith.

In addition, EPOS has discussed the pen in dozens of American print or television interviews since 2006. (*See* Turbahn Decl. ¶ 16.) The EPOS pen has been featured, for example, on *Good Morning America* on January 6 and 7, 2007; CNN on January 7, 2007; *Rolling Stone* on January 7, 2007; *Consumer Reports* on January 9, 2007; and the *New York Times* on January 10, 2007. (*Id.*; *see also id.* ¶ 17; Exh. C.)

At the time it filed its complaint, EPOS had expected its pen to be on the market in the United States in the first half of 2007. (Turbahn Decl. ¶ 19.) That date has slipped slightly, due in part to Pegasus's allegations of infringement. (*See id.* ¶¶ 19-24; *see also infra.*) But the first large scale production of EPOS pens is currently taking place. (*See id.* ¶ 18.) EPOS fully expects that its pen will be on sale to customers in the United States by no later than September or October 2007 (*see id.*)—well before any ruling on infringement is rendered in this action.

## C.    Pegasus's Threats and Allegations.

Pegasus also develops and markets digital pens. (Turbahn Decl. ¶ 8.) On December 31, 2006, Pegasus sent a letter to EPOS and several of EPOS's investors, who were copied on the letter. (*See* Turbahn Decl. ¶ 23; Exh. D.) The letter accuses EPOS's *"ultrasonic digital pen product"* of infringing Pegasus's patents and insists that EPOS "forbear from making, using and/or selling *the* infringing product." (*Id.*) The letter further states that "Pegasus is determined to vigorously enforce its intellectual property . . . ." (*Id.*)

In addition to sending the letter to several of EPOS's investors, Pegasus has told a number of EPOS investors, customers and potential business partners that EPOS is infringing its patents and that Pegasus intends to sue EPOS. (Turbahn Decl. ¶¶ 21-22, 24; Hoshen Decl.[2] ¶¶ 2-4.) As a result of these accusations, EPOS's deals have been closing more slowly (or not at all), and EPOS has had to spend a great deal of time addressing the concerns of investors and potential business partners instead of focusing on the business of marketing and distributing the

---

[2] The abbreviation "Hoshen Decl." refers to the Declaration of Yoav Hoshen in Opposition to Defendant Pegasus Technologies Ltd.'s Motion to Dismiss or, in the Alternative, For a More Definite Statement, filed concurrently herewith.

pens. (*See* Turbahn Decl. ¶¶ 19, 24.) For example, EPOS was recently engaged in talks to enter

into a business arrangement with Motorola, but after Motorola inquired about the legal dispute

between EPOS and Pegasus, the deal stalled. (*See id.* ¶ 24; Hoshen Decl. ¶¶ 2-4.)

### D.    Pegasus's Examinations of the EPOS Pen.

Pegasus is well aware of the products that EPOS has on the market. Pegasus

representatives visited EPOS's customers' booths at which the EPOS pen was displayed and

demonstrated at the CES show in Las Vegas in January 2007 and at the Centrum für Büro und

Informationstechnik ("CeBIT") exposition in Hanover, Germany, in March 2007. (Turbahn

Decl. ¶ 12.) They also had the opportunity to use the EPOS pens at the shows. (*Id.*) In addition,

given the threatening letter that it sent to EPOS in December 2006, it is reasonable to assume that

Pegasus has obtained an EPOS pen. As noted, that letter accused Pegasus's "*ultrasonic digital*

*pen product.*" (*See id.* ¶ 23; Exh. D.) Pegasus certainly does not state – nor could it state – in its

memorandum in support of its motion that it has not viewed and examined a sample EPOS pen,

or that it does not know what EPOS's pen products are; it merely states that the Complaint's

allegations are not explicit enough. (*See* Mem.[3] at 6.)

### E.    The Difference Between EPOS's and Pegasus's Technologies

The EPOS pen represents a breakthrough in technology: it uses acoustic signals

containing special properties that allow the pen to provide very high resolution. (Turbahn

Decl. ¶¶ 6-7; Exh. B.) The pen uses a synchronization method that reliably links the pen's

transmissions to the receiver. (*Id.*) Even in an environment full of interference, the high

accuracy allows the text captured by the pen to appear almost instantaneously on a computer

screen when the pen is linked directly to a computer. (*Id.*) The technology allows coded

transmission so that two pen users can sit next to one another using EPOS pens without risk of

---

[3] The abbreviation "Mem." refers to the Memorandum in Support of Defendant Pegasus Technologies Ltd.'s Motion to Dismiss or, in the Alternative, for a More Definite Statement, filed June 28, 2007.

compromising or commingling their data.  (*Id.*)  It is also very affordable; the suggested retail price for a digital pen with a 512-megabyte USB flash drive is as low as $80.  (*Id.*)

In contrast, Pegasus pens use a transmitter, signal, and receiver that are substantially different from the EPOS technology.  (Turbahn Decl. ¶ 8.)  Unlike the EPOS pens, the Pegasus pens rely on a pulsing method that has been known for several decades; World War II submarines used pulse-echo technology for distance estimations.  (*Id.*)  The result of this older technology is a pen that is less accurate, that suffers a lag between the actual time of writing and the time of appearance on a computer screen, and that cannot handle multiple users in the same manner as the EPOS pen.  (*Id.*)  The Pegasus pens tend to be more expensive, too.  (*Id.*)

Because EPOS's new technology is substantially better than the old technology Pegasus uses, Pegasus is apparently seeking to prevent EPOS from competing in the U.S. market by making unfounded allegations and threats – not just to EPOS, but also to EPOS's investors, customers and potential business partners.

## III.    ARGUMENT

### A.    Pegasus's Motion to Dismiss for Lack of Subject-Matter Jurisdiction Should Be Denied Because There Is an Actual, Ripe Controversy Between the Parties.

#### 1.    An Actual Controversy Exists Because EPOS Is Suffering An Actual Injury Caused by Pegasus that Can Be Redressed by Judicial Relief and that Is of Sufficient Immediacy and Reality to Warrant the Issuance of a Declaratory Judgment.

In the wake of *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. ___, 127 S. Ct. 764 (2007), the Federal Circuit has promulgated a new test for "case or controversy": "the sole requirement for federal court jurisdiction under [the Declaratory Judgment Act] is an 'actual controversy,' which is the same as an Article III case or controversy.  This means that . . . a declaratory judgment plaintiff is only required to satisfy Article III, which includes standing and ripeness, by showing under 'all the circumstances' *an actual or imminent injury caused by the defendant* that can be redressed by judicial relief and that is of 'sufficient immediacy and reality to warrant the

-6-

issuance of a declaratory judgment.'" *Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*,[4] 482

F.3d 1330, 1338 (Fed. Cir. 2007) (quoting *MedImmune*, 127 S. Ct. at 771) (internal citations

omitted; emphasis added).

Here, the key facts reflect an actual injury caused by Pegasus. The EPOS pen is on the

verge of entering the American consumer market, and a substantial batch of pens will soon arrive

in the United States. (*See* Turbahn Decl. ¶¶ 17-19; Exh. C.) In addition, EPOS has already

offered its pens for sale and used them in the United States. (*See id.* ¶¶ 11, 15-16; Exh. C.)

EPOS needs to be able to sell its products freely in this country. But Pegasus has accused EPOS

of infringement, and Pegasus is trying to intimidate EPOS's investors and business partners by

accusing EPOS of infringing its patents. (*See id.* ¶¶ 20-24; Hoshen Decl. ¶¶ 2-4.) Pegasus's

actions are interfering with EPOS's business opportunities. (*See* Turbahn Decl. ¶ 24; Hoshen

Decl. ¶¶ 2-4.) In addition, EPOS's personnel must spend their time combating the infringement

charges instead of focusing on the business of marketing and distributing digital pens. (*See

id.* ¶¶ 19, 24; Hoshen Decl. ¶¶ 2-4.)

Thus, EPOS is suffering a real injury right now that is rectifiable by a judgment declaring

that Pegasus's patents are not infringed by EPOS and are not valid. Once EPOS obtains this

judgment, Pegasus's unfounded allegations will be discredited, and EPOS's potential and

existing investors and business partners will no longer be intimidated. Therefore, EPOS has

demonstrated an injury "that can be redressed by judicial relief and that is of 'sufficient

immediacy and reality to warrant the issuance of a declaratory judgment.'" *Teva*, 482 F.3d at

1338 (quoting *MedImmune*, 127 S. Ct. at 771).[5] Accordingly, the facts of this case satisfy the

Declaratory Judgment Act's definition of "case" or "controversy."

---

[4] As an academic matter, Pegasus is incorrect when it states that the second part of the
previous Federal Circuit test survived *MedImmune*. (*See* Mem., at 5-6.) The Federal Circuit
made it clear in *Teva* that it had repudiated the entirety of the old test. *Teva*, 482 F.3d at 1338
("By following *MedImmune*, we recognize that we are not relying on our two-part reasonable-
apprehension-of-suit test.")

[5] Indeed, the injury to EPOS is of greater "immediacy and reality" than that faced by the
declaratory judgment plaintiff in *MedImmune*. *See MedImmune*, 127 S. Ct. at 777 (holding that a
(Footnote continues on next page.)

### 2.     Pegasus's Arguments for Lack of Subject-Matter Jurisdiction Are Legally Flawed and Factually Disproved.

"A Rule 12(b)(1) motion may be treated as either a facial or factual challenge to the court's subject matter jurisdiction." *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) (citations omitted).  In arguing that EPOS's complaint should be dismissed for lack of subject-matter jurisdiction, Pegasus jumbles the law by arguing that because the allegations are *facially* deficient, no *facts* exist to support an actual case or controversy.  (*See* Mem. at 8-10.)  It is notable that Pegasus never claims a controversy does not exist because EPOS is not infringing.  Instead, Pegasus argues that "there is no actual controversy because the allegedly non-infringing products have not been specifically identified, and there is no allegation that the design of the allegedly non-infringing products has been finalized, or that they are being manufactured in or being exported to the United States." (Mem. at 8.)[6]

To the extent that Pegasus is arguing that there is no controversy here because the facts are not ripe, its position is legally mistaken.  As noted above, the facts here satisfy the declaratory judgment test.  *See also MedImmune*, 127 S. Ct. at 771 n.8 (indicating that where a case such as this one is ripe, subject-matter jurisdiction is satisfied).  A declaratory-judgment plaintiff need not expose itself to infringement liability in order bring an action for declaratory relief.  *See id.* at 775; *see also, e.g., Judkins v. HT Window Fashions Corp.*, No. 07-0251, 2007 U.S. Dist. LEXIS 42468, *23-26 (W.D. Pa. June 8, 2007) (holding that plaintiff was not required

---

(Footnote continued from previous page.)

court has jurisdiction over a "nonrepudiating licensee" suit for declaratory judgment).  In both *MedImmune* and the present case, the patentee sent a letter threatening to enforce the patent.  See *id.* at 768.  In *MedImmune*, however, the declaratory judgment plaintiff was able to avoid imminent injury – potential damages and an injunction in a patent infringement action – by continuing to pay royalties on an existing license.  *Id.*  In the present case, there is no existing license that would allow EPOS to avoid the imminent injury of a patent infringement suit brought by Pegasus, and EPOS has further suffered real harm as a result of Pegasus's unfounded allegations and interference with EPOS's business.

[6] While attempting to deny that there is a controversy between the parties, Pegasus's use of the phrase "allegedly non-infringing products" to refer to EPOS's products makes clear that Pegasus continues to assert, as it did in its letter, that EPOS's pen products infringe.

to engage in allegedly infringing activity before seeking declaratory relief). Moreover, Pegasus is well aware of the fact that EPOS is currently engaged in "use" and "offer to sell" activities that already expose EPOS to an infringement suit. *See* 35 U.S.C. § 271.

To the extent that Pegasus is arguing that the allegations are facially deficient, Pegasus is also wrong: federal procedure does not require specific facts, but rather, a short and plain statement that "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. ___, 127 S. Ct. 2197, 2200 (2007) (*per curiam*) (internal quotations omitted). EPOS's complaint does just that. (*See* §§ III.B.2-B.3, *infra*.)[7]

### 3.    Pegasus's References to Issues of Personal Jurisdiction Are Inapposite.

In its memorandum, Pegasus inexplicably makes repeated references to issues of personal jurisdiction. (*See* Mem. at 2-3.) For example, on page 2, Pegasus states, "There is no allegation that any investors are U.S. entities. Upon information and belief, the identified investors are located in Israel." On page 3, it states, "Paragraphs 16 and 17 of the Complaint relate to Dane-Elec, a company traded on the Paris Stock Exchange. Again, there is no nexus between the allegations set forth in these paragraphs and this jurisdiction or the United States."

Not only are these statements factually inaccurate,[8] but they also have nothing to do with whether or not subject-matter jurisdiction is proper. Subject-matter jurisdiction stems from the Patent Code and the Judiciary and Judicial Procedure Code. *See* 35 U.S.C. §§ 1 et seq.; 28 U.S.C. §§ 1338(a), 2201, 2202.[9]

---

[7] *See also Cook v. Winfrey*, 141 F.3d 322, 326 (7th Cir. 1998) ("Imperfections in pleading style will not divest a federal court of jurisdiction where the complaint as a whole reveals a proper basis for jurisdiction.") (quoting *Loss v. Blankenship*, 673 F.2d 942, 950 (7th Cir. 1982)).

[8] For example, Dane-Elec has an American subsidiary located in Irvine, California. *See* Dane-Elec Memory: Welcome to Dane-Elec Memory, http://www.dane-elec.fr/us/ (last visited July 10, 2007) (showing a Dane-Elec Manufacturing factory in Irvine, California, under the hyperlink "See all subsidiaries and branches").

[9] As for personal jurisdiction, it is proper here pursuant to 35 U.S.C. § 293.

Accordingly, Pegasus's arguments for lack of subject-matter jurisdiction are without merit.

**B.    Pegasus's Motion to Dismiss for Failure to State a Claim Should Be Denied.**

    **1.    Because a Pleading Need Only Provide Fair Notice, Not Specific Facts, a Rule 12(b)(6) Motion Is Disfavored and Seldom Granted.**

"Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief. Specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Erickson*, 127 S. Ct. at 2200 (internal quotations and alterations omitted). "The Rule 8 standard contains 'a powerful presumption against rejecting pleadings for failure to state a claim.'" *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997) (quoting *Auster Oil & Gas, Inc. v. Stream*, 764 F.2d 381, 386 (5th Cir. 1985)). Indeed, "Rule 12(b)(6) motions are especially disfavored and are rarely granted." *Johnson v. United States*, 735 F. Supp. 1, 4 (D.D.C. 1990); *accord Cellars v. Pacific Coast Packaging, Inc.*, 189 F.R.D. 575, 577-78 (N.D. Cal. 1999).

    **2.    EPOS's Complaint Sets Forth Allegations Entitling It to Relief.**

In analyzing a motion based on Rule 12(b)(6), factual allegations are assumed to be true. *See Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004). In addition, the complaint is construed liberally, "granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005). EPOS has made the following allegations in its complaint:

- Pegasus is the assignee of the '330, '371, '742, and '565 patents (Compl. ¶¶ 8-11);

- EPOS intends to sell products in the United States (Compl. ¶ 3) that Pegasus has accused of infringing the patents-in-suit (Compl. ¶¶ 3, 14-15, 17, 18, 19, 21; Exh. E to Compl.);

- Pegasus is injuring EPOS by claiming that EPOS infringes Pegasus's patents (*see* Compl. ¶¶ 14-17, 20-21);

- EPOS does not, in fact, infringe the patents-in-suit (Compl. ¶¶ 23-38); and

- The patents-in-suit are invalid and unenforceable (Compl. ¶¶ 39-46).

When proven true, these allegations entitle EPOS to relief in the form of a declaratory

judgment and an injunction. *See* 35 U.S.C. §§ 102, 103, 112, 271; 28 U.S.C. §§ 2201, 2202; *see*

*also Erickson*, 127 S. Ct. at 2201. Therefore, EPOS's complaint should not be dismissed for

failure to state a claim.

### 3. Pegasus's Argument for Failure to State a Claim Once Again Ignores the Law and the Reality of Its Own Role in Defining the Accused Product.

Pegasus's argument for failure to state a claim rests on the position that the complaint

fails to allege any infringing or imminently infringing activity. (Mem. at 9.) Yet Pegasus itself

acknowledges that the complaint states that EPOS "*intends* to sell" allegedly infringing products.

(*Id.*; emphasis in original.) EPOS disputes that this allegation is somehow deficient. But even if

one assumes it is, the law still holds that the allegation stands up to a dismissal challenge under

Rule 12(b)(6).

Looking only at the complaint itself as well as properly submitted exhibits attached to the

complaint, *see Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), the Court is

required to construe the allegations in the light most favorable to the plaintiff, drawing inferences

in the plaintiff's favor wherever possible. *See Warren*, 353 F.3d at 39; *Thomas*, 394 F.3d at 972.

Here, the allegation that EPOS intends to sell its products in the United States coupled with the

content of Pegasus's December 31, 2006 letter, readily supports the fact that EPOS *imminently*

intends to sell the allegedly infringing products in the United States. Indeed, Pegasus's

December 31, 2006 letter implicitly reveals that it knew of this imminent activity, was aware of

EPOS's marketing efforts, and had analyzed a sample of the product that was about to be

launched in the United States.

Construing the allegations in the light most favorable to EPOS, the supposedly missing

"imminently infringing activity" is fully supported in the complaint. Accordingly, the

allegations plainly satisfy the Rule 12(b)(6) standard.

Pegasus also argues that the complaint fails to provide sufficient notice of the EPOS products at issue (*see* Mem. at 8), but this argument is unsupportable in light of Pegasus's December 31, 2006 letter (attached to the complaint as Exhibit E). Pegasus's letter accuses EPOS's "*ultrasonic digital pen product*" of infringing Pegasus's patents, and insists that EPOS "forbear from making, using and/or selling *the* infringing product." (Compl. ¶ 19; Exh. E.) EPOS sells only two products, which are described in detail on EPOS's website, and the "*ultrasonic digital pen*" that was identified in Pegasus's letter is common to both of those products. (*See* Turbahn Decl. ¶¶ 3-5.) Pegasus clearly knew what device it had in mind when it sent its letter.

The complaint also states that "Plaintiff intends to sell products, *which defendant asserts infringe the patents-in-suit . . . .*" (Compl. ¶ 3 (emphasis added).) The complaint goes on to explain that the letter was sent to EPOS's investors (*see id.* ¶¶ 20-21), and immediately thereafter, states, "Plaintiff . . . therefore seeks a judicial determination and a declaration of the respective rights and duties of Plaintiff and Defendant . . . ." (*Id.* ¶ 22.) In other words, EPOS wants declaratory relief regarding the product that Pegasus claims infringes. Thus, Pegasus itself has defined the accused product. Having defined it in the first place, Pegasus cannot now pretend that it has no idea what the accused product is.

Pegasus's arguments for dismissal pursuant to Rule 12(b)(6) therefore lack any basis whatsoever in fact or law, and its motion on this ground should be denied.

### C.    Pegasus's Motion for a More Definite Statement Should Be Denied Because the Details Sought Are Obtainable Through Discovery, and Pegasus Can Respond to the Allegations without Prejudicing Itself.

A motion for more definite statement is also disfavored and seldom granted. *Towers Tenant Ass'n v. Towers Ltd. P'ship*, 563 F. Supp. 566, 569 (D.D.C. 1983); accord *Cellars*, 189 F.R.D. at 577-78. "A motion under Rule 12(e) should only be granted if the complaint is so excessively vague and ambiguous as to be unintelligible and as to prejudice the defendant seriously in attempting to answer it." *Hartford Fire Ins. Co. v. Socialist People's Libyan Arab Jamahiriya*, No. 98-3096 (TFH), 1999 U.S. Dist. LEXIS 15035, *17 (D.D.C. Sept. 22, 1999)

(internal quotations omitted); *accord Cellars*, 189 F.R.D. at 578.  If the information sought by the motion is obtainable through discovery, the motion should be denied.  *Beery v. Hitachi Home Elecs. (Am.), Inc.* 157 F.R.D. 477, 480 (C.D. Cal. 1993); *see also Towers*, 563 F. Supp. at 569-70 (denying motion for a more definite statement because details such as "dates, times, names and places" are "the central object of discovery, and need not be pleaded").

The counts at issue in this case revolve around the following two simple points: (1) EPOS does not directly or indirectly infringe any of the four patents at issue, and (2) the four patents at issue are invalid and unenforceable.  (*See* Compl. ¶¶ 23-46.)  Given that Pegasus has already sent a letter stating that it believes that the EPOS pen infringes the patents at issue, it is safe to say that Pegasus can easily deny that its patents are not infringed, not valid, and not unenforceable without prejudice to itself.  *See Hartford*, 1999 U.S. Dist. LEXIS 15035, *17; *Cellars*, 189 F.R.D. at 578.  As for the explicit details that Pegasus seeks, these are easily obtainable through discovery.  *See Beery*, 157 F.R.D. at 480; *Towers*, 563 F. Supp. at 569-70. Moreover, a pleader is not required to establish at the pleading stage each and every element necessary to survive a motion for summary judgment.  *See Gilligan*, 108 F.3d at 249.  *See also Erickson v. Pardus*, 127 S. Ct. at 2200 (A pleading need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.")  Therefore, Pegasus's motion for a more definite statement is without foundation and should be denied.

**D.    Denial of EPOS's Request for Declaratory Relief Would Allow Pegasus to Continue its Campaign of Threats and Unfounded Accusations.**

Pegasus is engaging in a systematic campaign to damage EPOS and to prevent it from selling its product.  EPOS does not believe that it infringes any valid claim of any of Pegasus's patents, and seeks to resolve this dispute between the parties so that EPOS's existing and potential business partners and investors are no longer subjected to or scared off by Pegasus's threats.  (Turbahn Decl. ¶ 25.)  Furthermore, EPOS is already facing potential infringement liability:  it has used the accused product multiple times (*id.* ¶ 11), and it has offered the product for sale (*see id.* ¶¶ 15-16).  If the Court were to dismiss this suit, Pegasus could continue

maligning EPOS to EPOS's existing and potential investors and business partners and then could bring suit at its leisure when and where it chooses. In the meantime, Pegasus's infringement allegations would continue harming EPOS's business.

Here, the kind of harm that EPOS is suffering is precisely the kind of harm that the Declaratory Judgment Act was meant to prevent, and there are no facts present that justify dismissal. Accordingly, EPOS respectfully requests that the Court not dismiss this case in the exercise of its discretion.

## IV.    CONCLUSION

For all of the above reasons, EPOS respectfully asks the Court to deny Defendant Pegasus Technologies Ltd.'s Motion to Dismiss or, in the Alternative, for a More Definite Statement.

Dated: July 12, 2007                    Respectfully submitted,

By:    /s/ George Brian Busey
George Brian Busey (DC Bar No. 366760)
gbusey@mofo.com

MORRISON & FOERSTER LLP
2000 Pennsylvania Ave., NW Suite 5500
Washington, DC 20006
Telephone: (703) 760-7700
Facsimile: (703) 760-7777

Attorneys for Plaintiff
EPOS TECHNOLOGIES LTD.

la-928879

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

EPOS TECHNOLOGIES LTD.,

                Plaintiff,

      v.

PEGASUS TECHNOLOGIES LTD.,

             Defendant.

Case No.   07-cv-00416 (RWR)

**DECLARATION OF YOAV HOSHEN IN OPPOSITION TO
DEFENDANT PEGASUS TECHNOLOGIES LTD.'S MOTION TO DISMISS
OR, IN THE ALTERNATIVE, FOR A MORE DEFINITE STATEMENT**

I, Yoav Hoshen, hereby declare as follows:

      1.      I am the Vice President of Sales and Business Development at EPOS Technologies, Ltd.  I have personal knowledge of the facts set forth below and if called as a witness I could and would testify competently to them.

      2.      On April 12, 2007, I met with Motorola employees York Shao, a software engineer, and Katherine Li, an employee responsible for legal issues, in Beijing, China.  The purpose of our meeting was to discuss a business opportunity relating to EPOS's pen product that would benefit both EPOS and Motorola.

      3.      During the meeting, the first issue that the Motorola representatives raised was "legal disputes."  I asked them why they were raising that issue and whether other vendors were being asked the same question. They told me that only EPOS was being asked, and they clearly stated that it was because "Pegasus claims that EPOS infringes its IP."  I therefore had to spend a significant amount of time during the meeting explaining why EPOS believes that it does not infringe Pegasus' U.S. patents.

la-928425

4.    As of this date, EPOS has not entered into an agreement with Motorola.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 11, 2007, at Hod Hasharon, Israel.

Yoav Hoshen

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

EPOS TECHNOLOGIES LTD.,

Plaintiff,

v.

PEGASUS TECHNOLOGIES LTD.,

Defendant.

Case No.    07-cv-00416 (RWR)

**DECLARATION OF ODED TURBAHN IN OPPOSITION TO
DEFENDANT PEGASUS TECHNOLOGIES LTD.'S MOTION TO DISMISS
OR, IN THE ALTERNATIVE, FOR A MORE DEFINITE STATEMENT**

I, Oded Turbahn, hereby declare as follows:

1.      I am the Chief Executive Officer of EPOS Technologies, Ltd.  I have personal knowledge of the facts set forth below, except where stated on information and belief, and if called as a witness I could and would testify competently to them.

2.      EPOS Technologies Ltd. was formed in 2003.  It is a British Virgin Islands company, with its principal place of business in Israel.  Since its inception, EPOS has worked to develop advanced digital positioning technology.

3.      EPOS has developed the following products:  (1) a wireless digital pen and mouse and (2) a wireless digital pen and USB flash drive that plugs into a computer.  The pens allow students, businesspeople, professionals and other users to take notes of lectures or meetings on ordinary paper, and then have those notes appear in either handwritten form or typewritten form (using handwriting conversion software) on their laptop or desktop computers.

4.      Attached hereto as Exhibit A is a true and correct copy of printouts from the EPOS website, which describe the specifications for the two products that EPOS has developed.  This information can be found on the internet by going to http://www.epos-ps.com, and clicking

1

on "Products," then clicking on "Wireless Digital Pen & Mouse" or "Digital Pen & USB Flash Drive" to get a description of the products, and then clicking on "Product Spec" to get more detailed descriptions of the products.

5.     Both of the above-described products use the same digital pen. The pen works with two different receivers. In one product, the receiver is connected directly to a computer during use. In the other, a USB flash drive stores the data from the movement of the pen during use, and then, when later plugged into a computer, the data in the flash drive is transferred onto the computer.

6.     The EPOS pen employs a new technology: it uses acoustic signals containing special properties that allow the pen to provide very high resolution. The pen uses a synchronization method that reliably links the pen's transmissions to the receiver. Even in an environment full of interference, the high accuracy allows the text captured by the pen to appear almost instantaneously on a computer screen when the pen is linked directly to a computer. The technology allows coded transmission so that two pen users can sit next to one another using EPOS pens without risk of compromising or commingling their data. It is also very affordable. The suggested retail price for a digital pen with a 512-megabyte USB flash drive is as low as $80.

7.     Attached as Exhibit B is a true and correct copy of a printout from EPOS's website, which describes the digital positioning technology used in the EPOS pen. This information can be found on the internet at http://www.epos-ps.com/inr.asp?pid=1311& ppid=1312.

8.     Pegasus also develops and markets digital pens. EPOS's technology, however, is substantially different from that used by Pegasus. The Pegasus transmitter, signal and receiver are substantially different from the EPOS technology. Unlike the EPOS pens, the Pegasus pens rely on a pulsing method has been known for several decades; World War II submarines used pulse-echo technology for distance estimations.

9.    The result of this older technology is a pen that is less accurate, that suffers a lag between the actual time of writing and the time of appearance on a computer screen, and that cannot handle multiple users in the same manner as the EPOS pen. The Pegasus pens are generally more expensive, too.

10.    In November 2006, I conducted a press tour and made several customer visits in the United States to promote EPOS's pen.

11.    In early January 2007, I and three other EPOS employees attended the Consumer Electronics Show ("CES"), a major technology trade show that is held annually in Las Vegas, Nevada, to show and demonstrate the EPOS pen. I gave demonstrations of the pen at meetings with potential customers. In addition, representatives of Wow Technology, Inc., and Dane-Elec Memory, S.A., two of our customers, showed and demonstrated the EPOS pen at their respective booths. I personally observed many of these demonstrations. Furthermore, I attended a major CES media event called "ShowStoppers," where I demonstrated the EPOS pen to the media at EPOS's booth, and I also demonstrated the EPOS pen to the media at Dane-Elec's booth. I displayed the EPOS pen and used it in demonstrations over thirty times at CES, and other employees of EPOS also displayed and demonstrated the pen extensively.

12.    I am informed and believe based on information provided to me by Wow Technology personnel, that at the CES show, representatives from Pegasus Technologies Ltd. visited Wow Technology's booth, saw EPOS's pen products, watched a demonstration, and had the opportunity to try out and use the pen, and that Pegasus representatives did the same thing at the Centrum für Büro und Infsormationstechnik ("CeBIT") exposition in Hanover, Germany, in mid-March 2007.

13.    I handed out sample EPOS pens in the United States at the CES show described above and in meetings with customers and the media before, during, and after the CES show. I also have sent the pen to many other potential customers in the US. In all, we have distributed approximately ninety sample pens in the United States or to American customers.

3

14.     Since 2006, I and other EPOS employees have made approximately ten trips combined to the United States to show and demonstrate the EPOS pen to potential customers and the media.

15.     I and EPOS's employees have told hundreds of people in the United States that EPOS pens will be available in the United States this year. EPOS has received over 100 business inquires from VARs (Value Added Resellers), school district directors, business enterprises, distributors, and on-line resellers as well over 500 private inquires. EPOS has communicated to potential customers that the products will be available during September or October 2007.

16.     I have done over fifty demonstrations or interviews with American print or television media companies regarding the EPOS pen since 2006. This has resulted in, for example, the EPOS pen being featured on *Good Morning America* on January 6 and 7, 2007; CNN on January 7, 2007; and in *Rolling Stone* on January 7, 2007; *Consumer Reports* on January 9, 2007; and the *New York Times* on January 10, 2007. Attached as Exhibit C is a true and correct copy of a few of the articles covering the EPOS pen.

17.     The EPOS pen has been very well received by reviewers and customers, and we believe that EPOS is primed for entry into the United States market.

18.     Mass-production of EPOS pens is currently underway in China. The pens will be on sale to consumers in the United States by September or October of this year.

19.     EPOS had expected to enter the U.S. market earlier this year, but we have experienced delays, which in part were caused by Pegasus's allegations that EPOS's pens infringe its patents. As a result of these accusations, our deals have been closing more slowly, and we have had to spend a great deal of time addressing the concerns of investors and potential customers or joint venture partners instead of focusing on the business of distributing and marketing the pens.

20.     On or around August 28, 2006, Roni Hefetz, who is a general partner of Walden Israel, called me. Walden Israel is a venture capital company that has invested in EPOS. (Four of its five investors who have invested in EPOS are from the United States and the fifth is from

4

Israel.) Mr. Hefetz had just had a meeting with Gal Israely, a co-founder of Cedar Fund, which is one of Pegasus's investors. During that meeting, Mr. Hefetz informed Mr. Israely that Walden Israel had invested in EPOS. Mr. Israely responded by questioning why Walden Israel had invested in EPOS, and he stated that Pegasus was going to sue EPOS in the United States for patent infringement. Mr. Hefetz expressed concern to me regarding Pegasus's allegations and threat of suit and the effect that they would have on EPOS's business.

21.     Also in the fall of 2006, EPOS was in negotiations with Intel regarding an investment in EPOS. On or around November 13, 2006, Steve Gray, Senior Investment Manager at Intel Capital, contacted me and told me that he had just had a telephone call with Nimrod Schwartz, a member of Pegasus's Board of Directors, representing Cedar Fund. During that telephone call, Mr. Schwartz informed Mr. Gray that Pegasus believed EPOS was infringing Pegasus's intellectual property. My communication with Mr. Gray caused me to be greatly concerned that Pegasus was interfering with EPOS's relationship with a major potential investor.

22.     EPOS has a contract with Dane-Elec relating to EPOS's pen product. Dane-Elec is a large international flash memory and computer board company, as well as an EPOS investor. In late 2006, Jonathan Weizman, who is an employee of Dane-Elec, contacted me and told me that he had recently met with a Pegasus distributor representative by the name of Gilad Simchoni. The representative told Mr. Weizman that EPOS's products infringe Pegasus's patents and that EPOS lacked sufficient manufacturing capabilities to fulfill any contractual obligations to provide products to Dane-Elec.

23.     On December 31, 2006, Pegasus, through its counsel, sent a letter to EPOS Development Ltd. (a wholly owned subsidiary of EPOS Technologies Ltd.) and to some of EPOS's investors, stating that Pegasus's believes that EPOS Technologies Ltd.'s "ultrasonic digital pen product . . . infringes one or more claims of at least the following issued U.S. Patents: U.S. 6,392,330[;] U.S. 6,724,371[;] U.S. 6,841,742[;] U.S. 6,326,565." A true and correct copy of the December 31, 2006 letter is attached hereto as Exhibit D.

24.    Earlier this year, EPOS was engaged in negotiations with Motorola in Bejing, China, regarding a very significant business opportunity involving EPOS's pens.  During a meeting in April 2007, Motorola representatives told Yoav Hoshen, the EPOS Vice President of Sales and Business Development that "Pegasus claims that EPOS infringes its IP."  An in-house legal representative for Motorola was present at the meeting with Mr. Hoshen and wanted an explanation of Pegasus's allegations.  When Mr. Hoshen relayed the details of the meeting to me, he was upset that Motorola had raised this issue and he and I were extremely concerned that Pegasus was trying to kill our potential transaction with Motorola.  To date, we have not entered into an agreement with Motorola.

25.    We were forced to bring this action because of Pegasus's ongoing campaign to prevent investors, business partners, distributors, and customers from entering into transactions with EPOS by alleging that EPOS is infringing Pegasus's patents and that Pegasus intends to sue EPOS for patent infringement in the United States.  EPOS believes that it does not infringe any valid claim of any of Pegasus's patents, and seeks to resolve this dispute between the parties so that EPOS's existing and potential business partners and investors are no longer subjected to or scared off by Pegasus's threats.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 12, 2007, at Hod Hasharon, Israel.

Oded Tul

Oded Turbahn



**Input Devices**

# Wireless Digital Pen & Mouse



## The Ultimate Wireless PC Peripheral

EPOS Wireless Digital Pen & Mouse is the ultimate multi-purpose PC peripheral. Sleek and accurate, it doubles as both a digital pen and a mouse, enabling users to capture and display handwritten notes on a computer, enjoy full mouse functionality, and draw and share sketches via email and messaging applications - all without the need for special paper or tablet. Requiring only minimal battery power, the Wireless Digital Pen & Mouse quickly becomes an integral part of the user's natural PC environment.

## The Wireless Digital Pen for Everyone

The Wireless Digital Pen & Mouse is so easy to use it can be enjoyed by anyone of any age. Suitable for children, students, executive professionals, and even seniors, this unique PC tool offers users the latest in cutting-edge technology in a comfortable and familiar product.

## Full Mouse Functionality

One simple click of a button provides instant mouse functionality. Ergonomic and intuitive, users can point and click on icons, drag and drop files, and scroll up and down inside documents, as with any standard computer mouse. With pinpoint accuracy, multiple functionality and endless applicational uses, the Wireless Digital Pen & Mouse brings users an entirely new level of personalized interaction with their computer.

Features:
Capture and display handwritten notes on a computer.
Point and click with full mouse functionality.
Draw and share sketches digitally via email/messaging.
Transform written notes to text.
Personalize documents with handwritten notes/signatures.

**Input Devices**

# Wireless Digital Pen & Mouse


**Capture and display handwritten notes on a computer.**
Hand write notes, draw and sketch anywhere on the screen.


**Point and click with full mouse functionality.**
Drag, drop, and scroll as with an ordinary mouse.


**Draw and share sketches digitally via email/messaging applications.**
Make notes, draw faces, and scribble on emails - total digital freedom!


**Transform written notes to text.**
Watch as notes are transformed into text using standard handwriting recognition software.


**Personalize documents with handwritten notes/signatures.**
Sign forms online by digital signature and email, instead of printing and faxing.



## Product Specifications

**Digital Pen:**
- Cap with pocket clip to protect ink tip.
- Rubber grip to enhance pen usability.
- Pen weight: 16 grams.
- Sensitive pen-down switch for enhanced usability.
- Software configurable 2-way pen/mouse rocker-switch.
- Standard Batteries: easily replaced by removing battery cap at top of pen.
- Ink Refills: works with a standard mini refill and inkless stylus refill. Easily switchable.

**USB Clip (Receiver):**
- User Interface: indicator LEDs for user feedback, including power status and pen/mouse mode.
- Portable; small and lightweight.
- Incorporated paper clip; can attach to any side or corner of page.
- Handy refill extractor on back.

**System Requirements:**
- O/S: Windows 2000, Windows XP
- Pentium class PC
- 200MB available hard disk space
- 128MB RAM (recommended 256MB RAM)
- 1Ghz Processor and above
- Free USB Port (1.1 or 2.0)
- Handwriting recognition support for: WindowsXP Pro / Windows 2000


**Advanced Digital Positioning Technologies**
Tel: +972 (9) 7625700  Fax: +972 (9) 7625777  Email: sales@epos-ps.com  Website: www.epos-ps.com

Copyright © EPOS 2002-2007. All Rights Reserved. No part of this document may be reproduced in any form without the prior written consent of EPOS. EPOS reserves the right to revise this document and to make changes in the content from time to time without notice. EPOS may make improvements and/or changes to the product(s) and/or programs described in this document any time. The trademarks and service marks of EPOS are the exclusive property of EPOS, and may not be used without permission. All other marks are the property of their respective owners.

**Input Devices**



# Digital Pen
# & USB Flash Drive



### The Next Generation in Flash Memory Devices

EPOS Digital Pen & USB Flash Drive is the next generation in USB Flash Drive devices. A wireless digital pen with flash memory capabilities, the device enables users to write and sketch freely on any paper or surface, and store hundreds of pages of information in real-time, simply and easily. With its miniature form, low battery consumption and pinpoint accurate positioning technology, EPOS bundles all the benefits of a wireless digital pen together with the latest flash memory capabilities in one truly unique product.

### One Product, Many Uses

The Digital Pen & USB Flash Drive can be used by people of any age, in any environment: at school, home, and work. Ideal for taking notes in meetings, saving sketches and diagrams in the classroom, or simply jotting down notes and ideas on the go, this innovative PC peripheral fits neatly into any pocket, bag, or briefcase.

### Write it, Store it, Send it

A truly multifunctional device, all written information and sketches are captured accurately in real-time by the latest positioning technology, and automatically stored for later download to a PC. Information can be quickly and simply transformed to text using standard handwriting recognition software and sent by email or messaging apps. A convergent, versatile PC peripheral, the Digital Pen & USB Flash Drive is the next generation in USB flash drives, and the future of information input devices.

**Features:**
**Write and sketch** freely on any paper or surface.
**Store** hundreds of pages of information.
**Transfer** notes and sketches to a computer.
**Transform** written notes to text.
**Use** as regular flash memory to store music, image, video files, etc.

**Input Devices**

# Digital Pen & USB Flash Drive



**Write and sketch freely
on any paper or surface.**
Total freedom to write and draw anything,
anywhere, anytime.



**Store hundreds of pages of information.**
Write, draw, sketch, and save
for later download to a PC.



**Transfer notes & sketches to a computer.**
Download all pre-saved information quickly
and easily for soft copy use.



**Transform written notes to text.**
Watch as all notes are transformed into
text using standard handwriting
recognition software.



**Use as a regular flash memory device.**
Store and enjoy hours of music, images,
video files, and more.



**Product Specifications**

**Digital Pen:**
- Cap with pocket clip to protect ink tip.
- Rubber grip to enhance pen usability.
- Pen weight: 16 grams.
- Sensitive pen-down switch for enhanced
  usability.
- Standard Batteries: easily replaced by
  removing battery cap at top of pen.
- Ink Refills: works with a standard mini
  refill and inkless stylus refill. Easily
  switchable.

**USB Flash Drive:**
- Can be used as any other USB Flash drive
  to store files.
- Compatible with any standard USB port.
- Includes a rechargeable battery.

**User Interface:**
USB Flash drive with indicator LEDs for user
feedback, including drive memory status,
pen activity, battery, user buttons for changing
modes and tracking pages.

**System Requirements:**
- O/S: Windows 2000, Windows XP
- Pentium class PC
- 200MB available hard disk space
- 128MB RAM (recommended 256MB RAM)
- 1Ghz Processor and above
- Free USB Port (1.1 or 2.0)
- Handwriting recognition support for:
  WindowsXP Pro / Windows 2000



**Advanced Digital Positioning Technologies**
Tel: +972 (9) 7625700  Fax: +972 (9) 7625777  Email: sales@epos-ps.com  Website: www.epos-ps.com

Copyright © EPOS 2002-2007. All Rights Reserved. No part of this document may be reproduced in any form without the prior written consent of EPOS. EPOS reserves the right to revise this document and to make changes in the content from time to time without notice. EPOS may make improvements and/or changes to the product(s) and/or programs described in this document any time. The trademarks and service marks of EPOS are the exclusive property of EPOS, and may not be used without permission. All other marks are the property of their respective owners.



Search: [_____] Go

## Bringing Positioning Technology to Consumer Electronics

> Technology

**Competitive Edge**

Home>Technology>**Technology**

Back To Home

*"One of the most exciting concept products at CES with the greatest potential for an enthusiastic and wide acceptance."*

**Terry Hall, News Editor,**
Computer Desktop Encyclopedia
and Ziff Davis Internet Encyclopedia

**EPOS advanced digital positioning technology is based on the transmission of ultrasonic acoustic waves between two or more devices via a Transmitter and a Receiver.**

The Transmitter, embedded in a device such as a pen or other wireless terminal sends constant acoustic signals to the Receiver that in turn, uses them to measure the distance and position of the device(s).



**The Transmitter**
The Transmitter sends a unique "whistle" (an ultrasonic signal with specific time and spectrum characteristics assigned to each device) to the Receiver, constantly informing it of its position. The EPOS Receiver "hears" the whistle and uses the sound to estimate with pinpoint accuracy the timeframe it takes the acoustic wave to travel from the Wireless Terminal to the Receiver, by calculating time-of-flight (TOF).

**Time of Flight**
Although analog acoustic TOF measurements have been used for many years in determining position, EPOS' innovative technology has taken the acoustic domain and transferred it to the digital domain. The digitization of acoustic media enables EPOS to support many devices simultaneously (very much like cellular phones).

At the same time, other user experience-related positioning features were also greatly enhanced including: accuracy, power consumption and refresh rate.

Each wireless terminal is equipped with one or more ultrasonic transducers that transform electric signals into acoustic waves.

**The Receiver**
Each EPOS Receiver is designed to "hear" up to 96 different wireless terminals, each "whistling" its own individual signal, via two or more microphones embedded in the Receiver.

The number of transducers and microphones used depends on the application, as does the number of "degrees of freedom" (coordinates and angles in space) required for the wireless terminal. For example, for the simplest wireless input device (i.e. mouse/pen), only two coordinates (X, Y) of the pen tip are needed, therefore, only one transducer is required in the wireless terminal and two receiver microphones will suffice.

Many transducers can be placed in one wireless terminal as many microphones can be added to the receiver.

CREATED BY ▸ P3ENTA  Terms & Conditions  Copyright  Contact Us

All rights are reserved to EPOS Technologies Limited 2006

Case 1:07-cv-00416-RWR     Document 18-6     Filed 07/12/2007     Page 1 of 8

Tuesday, February 27, 2007

# Dane Elec introduces digital pen

## Irvine memory maker enters digital pen market

By TAMARA CHUANG
The Orange County Register

For the better half of the decade, **Dane Elec Memory** concentrated on storage devices. From some of the earliest pink USB drives to all flavors of flash-memory cards, the company charmed its way into big-name retailers like Costco and Target.

Now, the Irvine subsidiary of the same-named French memory manufacturer, is putting its memory into gadgets.

With partner **EPOS Technologies**, Dane Elec plans to start selling a digital pen kit this spring. The pen uses sonar technology to communicate wirelessly with a device that looks like a USB drive. The device picks up sound waves from the pen. Whatever the pen writes, the drive captures – all note taking and scribbling – and the data can be transferred to a computer and converted into a text document or Adobe PDF file.

This isn't the first time we've heard of a digital pen. Other 'inkless' pens, such as Logitech's io2 require special paper or are priced higher than consumers will pay. The Dane Elec pen works on any paper. And the company hopes to get prices below $100.

Dane Elec, which employs 40 people in Irvine and had about $100 million in sales last year, has not yet named the gadget. But the pen works. Jon Christeson, Dane Elec's director of marketing, demonstrated the product and we've posted the video (**WATCH NOW**).

The company also recently started selling the Meizu, a portable video player, a sleek white or black device which obviously took design cues from the iconic iPod, only Meizu comes with an FM tuner, video-editing software and a voice recorder. We've also posted a video of the Meizu online (**WATCH NOW**).

**Contact the writer:** 714-796-4952 or tchuang@ocregister.com

Case 1:07-cv-00416-RWR    Document 18-6    Filed 07/12/2007    Page 2 of 8

**NEWS**

# Gadget Geeks Unite! Consumer Electronics Show Opens

**From Lamp Speakers to Giant Televisions, CES Has Something for Everyone**

**Jan. 08, 2007 —**

From iPods to digital cameras and flat-screen televisions, the average American home now contains 26 consumer electronic products and spends an average of $1,500 on them per year.

The Consumer Electronics Show in Las Vegas is where many of those gadgets first see the light of day. "Good Morning America" tech guru Becky Worley picked the newest products guaranteed to tempt you -- or at least make you laugh.

### Jawbone Tooth Headset from Cingular

### Price: $120

This headset operates similarly to a cell phone with Blue Tooth, but this touches the outside of your jaw and minimizes outside noise. All users hear is the voice they want to hear on the phone.

### Walk Up Home Computer HP Touch Smart from Hewlett Packard

### Price: $1,799

A classy-looking computer screen, on a stand, allows you and your family to walk up to the screen and write notes, check a calendar of events and play music. This is the high-tech version of the family with a blackboard or wall of Post-Its in the kitchen.

### Wireless Digital Picture Frame from Kodak

### Price: $229

A special picture frame allows you to display digital photos downloaded from a distance.

### Motionsync Home Theater from D-Box

### Price: $10,000

Special equipment for your furniture. Your chair will rock 'n roll as you watch action movies and TV shows at home.

### Redlight Camera Detector from Cobra

### Price: $449

Similar to radar detectors, red-light detectors alert you that a traffic signal has a camera that snaps photos of cars rolling through red lights.

## Live TV and Internet in Your Car from Microsoft

### Price: $1,995 for Internet; $2,995 for live TV

Although some cars enable drivers and passengers to use the Internet, this function allows you also to watch local television shows live while driving or parked.

## Alive Elvis from WowWee

### Price: $349.99

This animated singing-and-talking bust of Elvis is based on the King's 1968 comeback TV special. It is operated with a microphone-shaped remote control.

## Duo Wireless Speaker Lamp Soundolier

### Price: $249

Guys love surround sound, and women love living rooms that don't look like movie theaters. The Soundalier is a state-of-the-art, omnidirectional speaker hidden within a stylish floor lamp.

The Soundolier Duo solves the two most common surround speaker installation challenges -- wiring and appearance. Most existing homes have no in-wall prewiring for surround speakers, requiring home theater lovers to either pay for expensive wire runs, live with unsightly exposed wires or do without.

Conventional surround speakers can be unsightly, competing with decorations when mounted on rear walls or, when placed on stands, with end tables or reading lamps.

## Golf Launchpad Electric Spin

### Price: $200-$249

Golf Launchpad from Electric Spin is a unique golf simulator available on Windows, Mac and PlayStation2 platforms. Play golf at home on the world's best golf courses with unbeatable comfort and convenience. You can even tee off against competitors online. From driving to putting, you can do it all, including playing along live with tournaments that are on TV.

## Sanza Express SanDisk

### Price: $59

Sanza Express is an mp3 player that is competitive with the iPod Shuffle. But it's actually better: it has a screen, so you can manipulate files on the go, instead of just accepting the Shuffle's order of things. It has a USB plug as part of the player that plugs directly into your computer -- no cord to lose. It holds 250 songs and it is $20 cheaper than the Shuffle.

## Digital USB Pen by EPOS

Digital pens have been around for a while, but the fact that they all require expensive special paper for note taking is enough to turn any poor ramen-fed student against them. EPOS may just have the answer to this problem by using 3D positioning to track its movements on any surface. The small receiver that comes with the pen is placed on top of the surface and wirelessly records the pen's movements, and is then plugged into the computer's USB port to download the text and drawings. Another bonus: As the name implies, the receiver doubles as a flash drive.

## Wireless Digital Music System by Sonos

Sonos is the first wireless, multi-room digital music system that lets you play digital music all over your house and control it all from the palm of your hand. With a wireless Sonos controller in hand, you'll have plug-and-play access to millions of songs from music services, Internet radio and your personal digital music collection. With Sonos Soneplayers in the rooms of your choice, you can play the same song in different rooms, or different songs in different rooms.

## 71-inch Plasma HDTV by LG

### Price: $14,999

LG Electronics has pushed the boundaries for home theatre with the announcement of a massive 71-inch high-definition (HDTV) monitor. LG repositioned its flagship 71-inch plasma full HD monitor, one of the largest plasmas available for consumer purchase, by cutting the price by 80 percent. When it was first introduced last year, it retailed for $70,000.

Copyright © 2007 ABC News Internet Ventures

# Kansas City Star

**Kansas City Star, The (MO)**

January 14, 2007

## What spelled success at CES

Author: DAVID HAYES; The Kansas City Star

Section: News
Page: G12

Article Text:

CONSUMER ELECTRONICS SHOW - The gadgets that got noticed the most

LAS VEGAS - It's tough to get noticed in a town where technology turns a lake into a video screen and hotels put HDTV flat screens in every room.

That was the challenge facing 2,700 exhibitors last week at the annual Consumer Electronics Show, a massive trade show that gives manufacturers a chance to trot out their latest and greatest to retailers and distributors.

Some do it with Elvis impersonators and Cirque Du Soleil dancers. Honda used its walking/talking/stair-climbing robot, ASIMO. Kansas City-based Handmark gave away a Porsche.

Creative Technology called on Kansas City's star gamer, Johnathan "Fatal1ty" Wendel, to do Quake shootouts with audience members.

The goal was the same: Get noticed in a crowd that grew to more than 140,000 before the show came to a close Thursday.

Flat screens ruled the show. Thousands, from 4-inch video picture frames to Sharp's somewhat silly 9-foot Aquos TV, were everywhere. A dual-format high-def disc player from LG won the best-in-show award presented by Cnet. The $1,200 BH100, which will ship in February, plays both HD DVD and Blu-ray discs.

F! or Garmin watchers, navigation gear was everywhere.

While the Olathe company's new Nuvi 660 was probably the most feature-loaded device on the show

floor, a device from startup Dash Navigation got the most notice.

The Dash Express is the first navigation device to offer two-way connectivity from the car. The unit uses Wi-Fi and cellular signals to send traffic data anonymously from your car. If traffic usually travels 55 miles per hour where you are and you're only moving at 25, it lets other Dash drivers in the area know there's a slowdown, offering them an alternate route.

The Dash Express is still in the testing phase and hasn't been priced yet.

The Dash Express won the CES navigation award.

Other best-of-show awards: The Sony HDR-HC7 high-definition camcorder ($1,400, shipping in February) was named the best camera/camcorder, and the Samsung FP-T5894W, a 58-inch plasma that uses wireless technology to eliminate connecting wires between the ! set and DVD players, DVRs and other peripherals, won for TVs ($5,800, in September).

Here are some of my favorites from CES:

I ve got to work this into the budget award:

When you're both disorganized and a collector, keeping track of what you ve accumulated can be a challenge. The $200 Flic Scanner Media Organizer from Microvision is a wireless scanner designed to help collectors (and perhaps the clutter-impaired) to keep track of what they ve got.

Scan the bar codes on music CDs, DVD movies and books with the small device, then plug it into a computer. The Flic retrieves cover art, title and track information from sources on the Net and loads them into a database for you.

There's more information at www.buyflic.com.

The Apple who? Microsoft what? award:

The SanDisk Sansa Connect does what Microsoft didn't do with the Zune -- it lets users download music wirelessly through a Wi-Fi connection. Available in March, the Connect also will link up with at least one music subscription service and has an inter! face that's easier to use than the iPod's.

The notes to you award:

Digital pens are nothing new. This one, however, has a very new and useful twist.

The Digital Pen & USB Flash Drive from Epos Technologies lets users take notes or just doodle on normal white paper. It records everything using a small flash-drive-based receiver that picks up sound waves from the pen.

Hundreds of pages can be recorded before downloading your work as a graphics file.

The company, on the Web at www.epos-ps.com, plans to sell the pen for about $80 this spring.

The better mouse without a trap award:

The MoGo Mouse X54 from Newton Peripherals lets road warriors get away from the sometimes balky laptop trackpad.

Small and thin enough to fit into a wallet (although I can't imagine that would be a good idea), the X54 is a three-button wireless mouse with a kickstand that connects to a laptop by Bluetooth. The battery recharges in a laptop's ExpressC! ard slot.

It will retail at about $80 starting in April.

T he flying photos award:

Kodak has taken the digital picture frame market a step further, offering a frame that lets users add new photos or video wirelessly

The Kodak Easyshare EX1011 has a 10-inch diagonal digital display that connects by Wi-Fi to your stored photos at the online Kodak Gallery. It also includes built-in stereo speakers for video sound.

The EX1011 will retail for $280 in March. An 8-inch version will sell for $240.

Trick out your iPod award:

All things wireless for the iPod were everywhere at CES.

The most useful was probably the $350 Evolve from Griffin Technology. Evolve includes a base to store and charge the iPod, and to store and charge two removable wireless speakers.

The flying Internet award:

Wireless hotspot? We don't need no steenking coffee shop.

While the major wireless companies are sparring over Internet via mobile phone, Autonet Mobile has developed a product that lets users develop their o! wn mobile Internet hotspot.

Autonet uses new technology that, while using service from Verizon Wireless, doesn't drop service and can work even in tunnels.

Once at your destination, the unit can be taken into a hotel room or campsite to create your own hotspot.

Autonet is expected to retail for about $399 this spring, with a $49 monthly service charge.

Information is available at www.goautonet.com.

Coming soon: Microsoft's Vista

Microsoft contends Vista is the first complete change in its flagship operating system since Windows 95.

Vista is loaded with hundreds of new features, many designed for entertainment -- and many quite Mac-like. For an upcoming article, The Star is looking for those who have beta-tested Vista. We d like to know what you think.

Send your thoughts, your hometown and a phone number where we can contact you to
dhayes@kcstar.com.

To reach David Hayes, call (816) 234-4904 or send e-mail to dhayes@kcsta! r.com.

Photos (5, color)

Copyright 2007 The Kansas City Star Co.
Record Number: 2066273

# DR. MARK FRIEDMAN LTD.

## PATENT ATTORNEYS

**Partners**
Dr. Mark M. Friedman, Chem. Eng.°
Daniel Michaels, Phys.
Dr. Alan Rosenthal, Chem. Phys.
Shalom Lampert, Chem. Eng.
Dr. Menachem Nathan, Mat. Sci.
°Also Admitted in the USPTO

**Legal Department**
Dr. Mark M. Friedman, Adv.°
Aryeh Litt, Adv.
Chaim Crown, Adv. °°
Eyal Booton, Adv.
Alan J. Barth, Adv. °°°
Sharon Bar-Ziv, Adv.
Kenneth Besser, Adv. °°°°
Dr. Daniel Laser, Adv.
°Also Admitted in Texas
°°Solicitor of the Supreme Court of England
°°°Also Admitted in Conn. & Mass.
°°°°Admitted in Ohio & Tenn. only

**Of Counsel**
Dr. Zvi Tamir, Adv.
Naveh, Kantor, Even-Har, Adv.

**Moshe Aviv Tower, 54th Floor**
**7 Jabotinsky Street**
**Ramat Gan 52520**
**Israel**

Telephone: 972 3 6114100
Facsimile: 972 3 6114101
Email: patents@friedpat.com
Website: www.israel-patent.com

Financial Controller: Yoel Bader
Chief Paralegal: Nomi Mizrachi
Head Secretary: Revital Elkanar
Notary: Aryeh Litt
Regulatory Consultant: Dr. Malka Chen Zion
Tech. Commercial Develop.: Avner Farkash
IP Portfolio Manager: Dr. Koby Karin

**Senior Associates**
Dr. Hanan Farber, Phys.
Dr. Moshe Van Dyke, Phys.°
Dinah Lewitan, Bio.°
Dr. Daniel Laser, Chem. Phys.
Dr. Shimon Lessoff, Aeron. Eng.
Yehoshua Lindberg, Mech. Eng.
° Admitted in the USPTO only

**Associates**
Dr. Reuven Mouallem, Chem. Phys.
Zev Farkas, Elec. Eng.
Sharone Tayar, Biochem.
Dr. Daniel Farb, Med.
Haim Factor, Mech. Eng. °
Kenneth Besser, Chem.
Yair David, Aeron. Eng.
Dr. Mervyn Doobov, Phys.
Zev Kremenchugsky, Chem.
Itzhak Efraim, Chem. Eng.
Itzhak Katz, Comp. Sci.
Joe Bazes, Chem. Eng.
Dr. Robert Vasl, Biochem.
° Admitted in the USPTO only

31 December, 2006

EPOS Development Ltd.
4 Haharash St. P.O. Box 7159
Hod-Hasharon, 45240
Israel
Fax: 97297625777

Dear Sirs,

This firm represents Pegasus Technologies Ltd. hereinafter "Pegasus" in intellectual property matters. Pegasus maintains a large portfolio of patents and patent applications designed to protect its highly valuable proprietary technology.

It has recently come to Pegasus' attention that EPOS Technologies Ltd. is about to introduce an ultrasonic digital pen product. We believe that this product infringes one or more claims of at least the following issued US patents:

US 6,392,330

US 6,724,371

US 6,841,742

US 6,326,565

You are hereby requested to forbear from making, using and/or selling the infringing product.  Pegasus is determined to vigorously enforce its intellectual property and will weigh all its legal options.

Yours truly,

Dr. Mark Friedman

Cc:   Intel Capital
      Shlomo Caine, Director, Central and Eastern Europe, Russia @ Israel Ruthie
      Sharon: Marketing Manager

Cc:    Walden Israel
       85 Medinat Hayehudim
       P.O. Box 4078
       Building G-10th Floor
       Herzliya Pituach, Israel
       Telephone : 97299618000
       Fax: 97299513461

Cc:   Jerusalem Technology Park
      Building 1
      Malha, Jerusalem 91487