# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EPOS TECHNOLOGIES et al.      *

                     *

       v.          *  Civil Action WMN-07-416

                     *

PEGASUS TECHNOLOGIES et al.    *

                     *

*    *    *    *    *    *    *    *    *    *    *    *

## MEMORANDUM

Currently pending before the Court are questions regarding the construction of certain disputed claim terms in this patent dispute. The parties have provided the Court with a full complement of memoranda advancing their respective proposed constructions for each disputed term, and the Court conducted a <u>Markman</u> hearing to further explore the parties' arguments. The parties also submitted supplemental memoranda regarding patent indefiniteness. Upon consideration of the applicable law, facts and arguments, the Court issues the following claim constructions.

## I.   BACKGROUND

Both EPOS and Pegasus make digital pens that track the motion of a pen or marker and convert the movements for display on a computer.[1] In 2007, EPOS sued Pegasus seeking a declaratory

---

[1] Plaintiff is EPOS Technologies, Ltd. Counterclaim Defendants include EPOS, Dane-Elec S.A., Dane-Elec Memory S.A., and Dane-Elec Corp. USA. Collectively, the Court will refer to them as "EPOS." Defendant is Pegasus Technologies Ltd. Counterclaim

judgment that its products do not infringe on four of Pegasus'
patents.  Pegasus then counterclaimed and alleged infringement
of six patents, including the first four at issue in EPOS'
Complaint plus two more.

There are six patents at issue in this case.[2]  Together, the
patents relate to a system developed to convert handwritten
markings—for example, notes on a dry-erase board—into a digital
image for display, storage or further manipulation.  The system
utilizes ultrasonic signals to track and triangulate the
position of the marking device on a writing surface.  At a
minimum, the technology requires: (1) at least two ultrasonic
signal receivers (or transmitters) mounted on the edge of a flat
surface (such as a dry-erase board); and (2) an ultrasonic
signal transmitter (or receiver) that attaches to the marker,
pen, or other marking device (such as a dry-erase marker) that
the user manipulates to write or draw.  The system triangulates
the position of the marker by calculating the time it takes the
ultrasonic signal sent from the marker's transmitter to reach
each receiver.  These time-of-flight (TOF) measurements are then
converted to distance measurements to determine the location of

Plaintiffs include Pegasus and Luidia, Inc.  The Court will
refer to them collectively as "Pegasus."

[2] The patents include U.S. Patent Nos.: 6,724,371 (the '371
patent); 6,841,742 (the '742 patent); 6,326,565 (the '565
patent); 6,392,330 (the '330 patent); 6,266,051 (the '051
patent); and 6,501,461 (the '461 patent).

the transmitter relative to the receivers, after which the system interprets that information and stores or displays it digitally.

Some patents at issue include inventions for multiple elements of the system. Thus, four patents relate to movable transmitters or receivers that attach to or are built into writing implements like markers and pens. Three involve claims regarding the composition of the entire digitization system, and a final patent pertains exclusively to the ultrasonic transceivers used to track the movable transmitter. All of the patents also include methods of implementing the inventions.

## II. LEGAL STANDARD

In Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005), the Federal Circuit comprehensively outlined the means by which a court should construe disputed claim terms in a Markman hearing. In essence, courts must determine the meaning of disputed terms as they would be understood by "a person of ordinary skill in the art" at the time the patent was issued. Id. at 1313. To do so, courts must first consider the patent's intrinsic information, starting with the language of the claims and using the patent specification, prior art and prosecution history when necessary. Id. at 1314. If the intrinsic information is insufficient, the Court may use extrinsic

information, including technical dictionaries, treatises and expert testimony.  Id.; see generally id. at 1312-19.

Claim construction begins with an examination of the claim language, because "the claims of a patent define the invention to which the patentee is entitled the right to exclude."  Id. at 1312.  The words of a claim "are generally given their ordinary and customary meaning."  Id.  Nonetheless, "the specification necessarily informs the proper construction of the claims," and "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention."  Id. at 1316-17.  "Ultimately, . . . [t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."  Id. at 1316.

If a disputed term is facially unambiguous, the Court may decline to impose its own construction.  Id. at 1312-13. Similarly, the Court may also decline to construct a term if the term is "indefinite" or "insolubly ambiguous," such that the term's meaning is so unclear that no amount of evidence could lead to a proper definition.  Halliburton Energy Servs., Inc. v. M-I LLC, 514 F.3d 1244, 1249 (Fed. Cir. 2008).  Courts, however, should avoid finding terms indefinite whenever possible because a patent with an indefinite term in an independent claim is

invalid and unenforceable.  Id.  As the Federal Circuit recently

opined:

> Of course, claims are not indefinite merely because
> they present a difficult task of claim construction.
> Instead, if the meaning of the claim is discernible,
> even though the task may be formidable and the
> conclusion may be one over which reasonable persons
> will disagree, we have held the claim sufficiently
> clear to avoid invalidity on indefiniteness grounds.
> Proof of indefiniteness requires such an exacting
> standard because claim construction often poses a
> difficult task over which expert witnesses, trial
> courts, and even the judges of this court may
> disagree.  Nevertheless, this standard is met where an
> accused infringer shows by clear and convinced
> evidence that a skilled artisan could not discern the
> boundaries of the claim based on the claim language,
> the specification, and the prosecution history, as
> well as her knowledge of the relevant art area.

Id. at 1249-50 (internal citations and alterations omitted.)

**III. ALLEGEDLY INDEFINITE TERMS**

The parties dispute several terms among and across all six

patents and have offered varying proposed constructions.  Among

the disputed terms are three that EPOS claims are indefinite, an

allegation that, if true, would render the patents in which the

terms appear invalid and unenforceable.  As these allegations

threaten the validity of entire patents, the Court will address

them first.

**1.   "Spatial frequency."  '330 Patent.**

The first claim term that EPOS argues is indefinite appears

in Claims 16 and 17 of the '330 patent.  The claim term in

dispute is underlined below.  The patent claims:

> 16. A method for providing mechanical protection for
> an ultrasound transducer used for given frequency of
> ultrasound signals while minimizing interference with
> the ultrasound signals, the method comprising
> positioning a protective grating adjacent to the
> transducer, the grating [h]aving a plurality of
> openings spaced at a spatial frequency of less than
> about half of the wavelength of the given frequency of
> ultrasound in air.[3]

'330, 12:27-31.

The words "special frequency" form the basis of EPOS'

objection. EPOS argues, simply speaking, that the claim

language misuses the word "frequency" in "spatial frequency."

Frequency is a measure of periodicity, or the number of times

something happens in a given time or distance (i.e., "ten cycles

per second" or "five bars per inch"). The claim language,

however, uses frequency in "spatial frequency" to refer to a

length. Consequently, EPOS argues that this is incorrect and

the Court should not rewrite an improperly written patent.

In contrast, Pegasus submits that the meaning of the term

as used in the patent is evident from its context. As such,

Pegasus suggests the Court construe the term as: "S is the

combined widths of an opening and a bar or element in the

grating. Lamda is the wavelength of the frequency of ultrasound

in air. S is less than about half of lamda." Pegasus then

---

[3] EPOS also challenges nearly identical language used in Claim
17. As the Court's analysis is identical for both Claim 16 and
Claim 17, the Court will only refer to Claim 16 here.

refers the reader to Figure 14 of the '330 patent's specifications.

EPOS is undeniably correct that the claim, if construed literally, is incoherent. The claim equates frequency and length as measures of the same property, but this is impossible as the two are distinct properties.[4] Frequency is inversely related to length, such that wavelength (lambda) is the quotient of propagation speed (c) divided by frequency (f). Thus, the question before the Court is whether the claim term as written is so insolubly ambiguous that no amount of evidence could lead a person of ordinary skill in the art to understand what it meant.

To begin with, the context of the claim itself provides a measure of evidence. The claim refers to "a protective grating . . . [with] a plurality of openings spaced at . . . ." This language indicates that what follows should define the repetitive structure of the grating's openings. On the basis of this language only, the grating's structure could, in theory, be

_____

[4] For example, granting several assumptions and generously substituting several phrases for the sake of clarity, the claim term as written could fairly be read as calling for "a plurality of openings with an openings-per-millimeter measurement of 2 millimeters." To make this example coherent, a reader would need to invert "openings-per-millimeter" to "millimeters-per-opening," just as reader would need to invert frequency before comparing it to length. Alternatively, the example would be coherent if "2 millimeters" were replaced with a value of frequency.

defined either in terms of periodicity or in terms of length.[5]

The claim proceeds, however, to refer to a specific length;
specifically, it refers to "about half of the wavelength of the
given frequency of ultrasound in air."  Granting that the
language immediately preceding "spatial frequency" does not
demand a definition in terms of either periodicity or length,
this leads to two possibilities.  Either the term "spatial
frequency" is correctly used to refer to periodicity and the
reference to wavelength is incorrect, or the reference to
wavelength is correct and the term "spatial frequency" is used
incorrectly.

At this stage, the claims themselves provide no further
elucidation, and the Court must look to the patent
specifications for additional evidence.  Here, the patentee's
intentions become clear.  When describing the grating at issue,
the specifications explain:

> [T]he present invention provides a protective grating
> structure 80 in which a periodic pattern of openings
> has a spatial period S of no more than [lambda]/2, and
> preferably no more than [lambda]/4, where [lambda] is
> the wavelength of the ultrasound working frequency in
> air.  By using a grating with a grating step S
> significantly smaller than existing systems, little or
> no directional disruption is caused to the ultrasound
> signals. . . . By way of practical example, for a
> working frequency of 90 kHz, corresponding to a

---

[5] For example, it would not be entirely incoherent to say the
grating should have "openings spaced at one opening per
millimeter," which would indicate that, say over the span of
five millimeters, the grating should have five openings.

wavelength in air of about 4 mm, a grating step of 1.9 mm has been found to offer minimal disruption to the transmission and reception of signals.

To minimize attenuation of the signal, the proportion of the grating which is open is preferably maximized, subject to the mechanical requirements for the structure.  In the aforementioned example, the open area of the grating is preferably at least about 70% of the total area within each [g]rating step.

Although shown here schematically [in Figure 14] in the form of a rectangular grating, grating 80 may clearly be implemented in a range of different forms . . . .  Thus for a cylindrical transducer, . . . grating is preferably implemented as a cylindrical outer sleeve having openings with periodic spacing S.

'330, 9:26-49.  Figure 14, to which the specifications refer,

appears as follows:



FIG. 14

80

S

On the basis of this explanation and the preferred

embodiment expressed in Figure 14, it is evident that the

patentee meant to define the grating's openings in terms of a

specific length, S.  S is a combined measure of the lengths of

one open slot and one structural component immediately adjacent

to the open slot, and it is equivalent to less than one-half or

9

one-quarter of a specific ultrasound wavelength.  Thus, the '330 patent unambiguously intends to define the structure of the grating's openings in terms of length and not in terms of periodicity.  In turn, it follows that the words "spatial frequency" must refer to a specific length, notwithstanding the plain and ordinary meaning of those words.  This is the only logical interpretation of the patent, and a reader of ordinary skill in the art—or any careful reader, for that matter—would understand the patent as such.

Nevertheless, EPOS argues that the Court should not selectively construct "spatial frequency" in a manner inconsistent with the ordinary definition of "frequency" used elsewhere in the patent.  In fact, Claim 16 itself uses the ordinary definition of "frequency" twice in the phrases preceding "spatial frequency."  Thus, EPOS argues the Court should not impose differing definitions for multiple appearances of the same word in the same claim.

Although EPOS' argument appeals to consistency and symmetry, it fails insofar as it refuses to account for the differing contexts in which the word appears at various times.  This is not a case in which "frequency" appears each time in the same context.  The word properly refers to a measure of periodicity the first two times it appears in Claim 16, which is consistent with the context and the patent's specifications.  It

is only the third and final use of the word that, when read out

of context, seems incoherent.  As described above, however, a

complete reading of the patent leads to only one possible

interpretation of "spatial frequency," notwithstanding its

ordinary definition.  The Court will not artificially impose an

incoherent construction for the sake of consistency, when doing

so would require it to ignore the unambiguous intent of the

patentee.

Consequently, the Court finds that the phrase "spatial

frequency," as it appears in Claims 16 and 17, is not

indefinite.  Moreover, Pegasus' proposed construction mirrors

closely the language of the patent specifications and will be

adopted.  The new construction for the relevant term is: "S is

the combined widths of an opening and a bar or element in the

grating.  Lambda is the wavelength of the frequency of

ultrasound in air.  S is less than about half [or one quarter]

of lambda.  See Fig. 14 of the Patent."

**2.    "Annotation implement," "operative implement," and**

      **"drawing implement."  '371 Patent.**

The next terms that EPOS argues are indefinite, "annotation

implement" and "operative implement," appear in the '371 patent.[6]

---

[6] EPOS does not argue that "drawing implement" is indefinite, but
it does challenge Pegasus' position that the term does not
require construction.  Because the Court's analysis of
"annotation implement" and "operative implement" implicates

Patent '371 involves a pen-like device that contains an ultrasonic transmitter and an infrared transmitter built inside the device's body.  One preferred embodiment of the device looks substantially like an ordinary pen and can be used as such.

The '371 patent refers to various types of "implements," which are described as replaceable cartridges inserted into the pen-like device.  One end of the cartridge protrudes from the device to make contact with the writing surface.  By analogy, a refillable ink cartridge in a standard pen would qualify as an "implement" because the cartridge is inserted into the pen's outer housing and the tip of the cartridge, the pen tip, is then used to write on paper.  In this context, the '371 patent refers to several types of "implements," including a "writing implement," '371, 2:29, an "operative implement," '371, 23:3, a "drawing implement," '371, 23:6, and an "annotation implement," '371, 23:7.[7]  The claims of patent '371 specifically refer to the latter three, and EPOS argues that both "operative implement" and "annotation implement" are indefinite.

The basis of EPOS' argument is that those two terms have no ordinary meaning, and that neither the patent's claims nor its

_____

"drawing implement," it will be discussed here.  EPOS also challenges the construction of "drawing implement" as it is used in two other patents, which are discussed separately below.

[7] The patent also refers to an eraser as another type of "implement."  '371, 16:61.

specifications provide a definition for "annotation implement."
It further argues that because "operative implement" is defined
in terms of "annotation implement," it, too, is indefinite,
especially because the patent provides no guidance as how the
two terms should be distinguished. Finally, EPOS submits that,
while not indefinite, the term "drawing implement" should be
constructed consistent with the manner in which that term is
used in the '565 and '742 patents.

EPOS does not challenge the definition of "implement." An
"implement," as used in the '371 patent, refers to the cartridge
structure discussed above. Thus, EPOS' question concerns the
distinction between the various types of implements, but the
question is answered by the ordinary definitions of the words
used throughout the patent's claims and specifications to modify
"implement." For example, "operative implement" is used
throughout the specifications merely to refer to whatever
implement the user has currently installed in the device. See
'371, 19:6-9. This is consistent with the ordinary meaning of
the word "operative," which the Oxford English Dictionary
defines as "characterized by operating or working, being in
operation or force." Oxford English Dictionary (3d ed. 2004).

As for the other terms, the specifications teach that the
"[o]perative implement is selectable among a plurality of
different operative implements, including, but not limited to,

drawing implements, e.g., of different colors, eraser implements and annotation implements." '371, 19:6-9.  Similarly, the patent also notes that the "[o]perative implement . . . can be, for example, a drawing implement, an annotation implement or an eraser." '371, 16:59-61.  Thus, it is evident that drawing, annotation, and erasing implements are different types of operative implements.  Moreover, the specifications provide no reason to depart from the ordinary meaning ascribed to "drawing" and "annotation."  The patent discusses using a "drawing implement" to draw, '371, 11:17-18, and an "eraser implement" to erase, '371, 13:55-58.  It also describes the invention as one that can be used for "digitizing graphical or textual data drawn on the face of a presentation board and for digitizing annotations with relation to a screen, such as a computer screen."  '371, 7:18-21.  Thus, the patent unambiguously applies the ordinary and customary meaning of these words, and the terms are not indefinite.  As such, the Court will decline to construct the terms "operative implement" and "annotation implement."  The Court will do the same for "drawing implement," because as the plain meaning of the term as it appears in the '371 patent is unambiguous, the Court need not look outside the patent claims for additional guidance.

**3.    "Given time interval." '742 and '565 Patents.**

The final term that EPOS argues is indefinite is "given time interval," as it appears in the '742 and '565 patents. Unlike the patents discussed above, EPOS argues that these patents do not need to be invalidated if "given time interval" is constructed to ascribe a more definite and concrete meaning to the words. Even Pegasus argues that a construction is appropriate for this term, so neither party argues that the term should remain as it appears in the patents. Consequently, the Court will impose a construction to avoid any argument that the term is indefinite.

The '742 and '565 patents seek to solve, among other problems, a deficiency of prior art pen-stroke digitization systems, in which those systems fail to record short, quick pen strokes a user makes in rapid succession, such as when a user attempts to draw a dashed line. When a user begins writing with a digital pen or marker, the pen tip triggers a switch inside the pen, and the pen "turns on" and begins transmitting a signal so the system can locate and track the pen's movements. This is called "pen-down" because the pen is placed down on the writing surface. There is a slight delay between pen-down and the time the system begins tracking because the system must locate the pen and process the signals. This delay is called the "resynchronization delay." Later, when the user removes the pen

from the writing surface ("pen-up"), the pen stops transmitting a signal, and the system stops tracking the pen.

In earlier systems, the resynchronization delay caused problems when the user would draw a dotted or dashed line because the pen stroke was so short the system could not resynchronize fast enough between each pen-up and pen-down motion.  To address this problem, the instant patents create a system in which the pen continues to transmit a signal for a few seconds after pen-up.  This way, the pen does not need to resynchronize between pen strokes, and the system is able to recognize a dotted line.  The patent claims call for the pen to continue transmitting for a "given period of time."

The claims teach that the pen should continue to transmit for "a given period of time," but they make no reference to the dashed-line problem.  The specifications, however, explain resynchronization delay issues exclusively within the context of the dashed-line problem.  To that end, the specifications suggest that the pen continue to transmit for "at least about half a second, and preferably between about 1 and about 2 seconds" after pen-up.  See, e.g., '742, 11:41-43.  Notably, neither the specifications nor anything else in the patent make any reference to the resynchronization delay problem outside the context of drawing dashed lines or similar quick pen strokes made in rapid succession.

EPOS submits that "given time interval" should be
constructed as "fixed at less than a few seconds" because the
patents contemplate only the dashed-line problem and, thus, the
deficiency the patents seek to solve would require the pen to
continue transmitting after pen-up for only a short amount of
time.  Moreover, EPOS formulates its proposed construction by
tracking the language of the specification, which calls for
continued transmission of "preferably between about 1 and about
2 seconds."

In contrast, Pegasus argues the disputed term should be
defined without an upper or lower bound because no such
limitations appear in the language of the claims.  In support of
its proposed construction, Pegasus submits that the patents seek
to solve the resynchronization delay problem generally, even in
contexts other than the dashed-line problem.  It argues that a
user may pause when writing "to think or listen," and the
invention allows the user to resume writing without a
resynchronization delay.  Pegasus Br. at 15.  It also argues
that the dashed-line problem presented only one example to which
the invention could be applied.  Thus, Pegasus submits that the
term should be constructed as "a specified time interval."

The specifications explicitly note that the
resynchronization delay is only troublesome when drawing short
dotted or dashed lines, and it is typically <u>not</u> a problem when

drawing continuous lines.  See '742, 11:24-25.  Because the patents define the problem as one arising from quick pen strokes made in rapid succession with very little pause in between them, it can be inferred that the problem did not extend to pen strokes made after much longer periods of time, such as when a user may pause "to think or listen," as Pegasus argues.  Thus, while the words of the claims do not limit the time interval, all evidence suggests there must be some upper-bound to the interval contemplated by the patentee, and there is no evidence to support Pegasus' contention that the patents sought to solve all resynchronization delay problems.  Consequently, a person of ordinary skill in the art, after reading the entire specifications, would understand that "given time interval" had some upper bound to it.

While EPOS' proposed construction more closely aligns with the patentee's manifest intent, it is also somewhat problematic. The upper bound of EPOS' proposal—"less than a few seconds"— comes too close to the two-second preference expressed in the specifications as one possibility.  As such, the Court will impose a minor, perhaps merely semantic adjustment to EPOS' proposal and construct the term as "fixed at a few seconds or less," which should expand slightly EPOS' proposal.  This expansion accommodates the need for an upper-bound to the term

and the recognition that the specifications are meant only to inform and not to confine the scope of the patent.

**IV.**    **DISPUTED TERMS**

The remaining terms in dispute do not raise questions of indefiniteness and do not threaten the validity of any of the patents.  Though some terms appear in multiple patents, they are cataloged below in alphabetical order.

**4.**    **"Drawing implement." '742 and '565 Patents.**

Patents '565 and '742 contemplate a device that attaches to a conventional marker, pen, or the like, preferably a dry-erase marker.  The device is essentially a sleeve into which a user inserts a writing utensil.  The sleeve contains an ultrasonic transmitter, among other things, thereby enabling a user to convert a conventional marker into one that can be tracked by the pen-stroke digitizing system.  Here, "drawing implement" refers to the writing utensil that the user inserts into the sleeve.  The claims specifically call for "a drawing implement comprising a body, a back end, and a front end opposite the back end comprising an operative tip," '742, 14:8-10, and a "drawing implement comprising a central axis and an operative tip," '565, 6:60-61.  Thus, these patents are different from the '371 patent.  Whereas the '371 patent teaches a pen-like device with a transmitter and ink cartridge contained within the device's

housing, these patents teach a sleeve that a user may retrofit around a stand-alone writing utensil, such as a pen or marker.

Pegasus argues that "drawing implement," as defined in the claims of the '565 and '742 patents, could be anything from a "stubby No. 2 pencil to a piece of charcoal." Pegasus Br. at 6. As such, Pegasus submits that the term requires no further construction and should not be narrowed. On the other hand, EPOS imports language from the specifications and preferred embodiments that indicate that the patentee designed the device specifically for use with a dry-erase marker or something similar. Consequently, EPOS proposes that the Court construct the term as "a conventional stand-alone pen or marker."

For this term, neither party has advanced a satisfactory solution. The plain language of the claims is indeed exceedingly broad, but neither the claims nor the specifications support the contention that the patent is so broad as to contemplate using the device with something like "a piece of charcoal," unless of course the charcoal had dimensions similar to those of a standard, more commonly-used writing utensil. On the other hand, nothing in the patents suggests that the drawing implement must be limited to a conventional pen or marker. To note one obvious example, a pencil would easily satisfy the claims' definition of "drawing implement." Thus, although some of the preferred embodiments refer specifically to dry-erase

markers, a person of ordinary skill in the art could easily conclude that the device taught by the patents could be used with a wide array of writing utensils.  A better construction will recognize that a "drawing implement," as that term is used here, is a stand-alone writing utensil, in the sense that it is a writing utensil that can be used as such, or that can be used in concert with the device; the device need not be retrofitted to the drawing implement in order for the drawing implement to draw.  To that end, the Court will construct the term as "a conventional writing utensil that can be used alone or together with the invention."

**5.   "Interference." '330 Patent.**

EPOS submits that "interference" requires no construction because it is widely understood in the art.  Pegasus argues that it should be construed as "obstruction, disruption, distortion, or directional non-uniformity."  EPOS, however, notes that neither the claims nor the specifications of the '330 patent address any problem related to the directional uniformity of the signal.  Instead, the patent appears to be concerned only with possible signal obstructions.

In response, Pegasus proposes replacing the reference to "directional non-uniformity" with "blind spots."  The term "blind spot," however, is ambiguous in this context.  Moreover, to the extent "blind spot" has an ordinary definition, it is

unclear how it would capture any type of interference not already covered by the other terms Pegasus uses in its proposal. Thus, the Court will adopt a compromise solution and construct the term as "obstruction, disruption, or distortion." This should cure EPOS' primary objection to Pegasus' initial reference to directional non-uniformity while still imbuing the term with an enhanced degree of nuance sought by Pegasus.

**6.    "Marking Implement." '461 Patent.**

Pegasus argues this claim needs no construction, while EPOS seeks to construe it as "an implement that has a marker tip (and not a pen tip)." Unlike the claims in the other patents at issue, the claims of patent '461 refer specifically to a "marker." See e.g., '461, 10:31-32. Moreover, while the specifications occasionally reference a "pen" and "pen tip," the totality of the specifications makes clear that the patentee was merely using those terms as synonyms for a dry-erase marker. See e.g., '461, 7:31-37 ("The . . . sleeve . . . has an inner diameter that is adapted to receive . . . a standard dry-erase marker. Thus, the herein-disclosed marking implement uses a marker . . . . The sleeve is tapered to follow the tapered contour of the pen.") Consequently, the Court will adopt EPOS' proposal.

**7.    "Means for affixing the unitary sensor array." '461 Patent.**

This disputed term appears in a means-plus-function claim of the '461 patent. A means-plus-function claim employs a specific, statutorily-provided, short-hand method of drafting a claim. Specifically, "[a]n element in a claim . . . may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112. In this claim, the phrase, "means for affixing the unitary sensor array," is equivalent to "means or step for performing a specified function without the recital of structure, material, or acts in support thereof." Consequently, the statute requires that the phrase "means for affixing the unitary sensor array" be construed "to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

Within that framework, EPOS proposes that this term be construed merely as a "means-plus-function claim with structure disclosed in figures 1-5" of the patent. Pegasus, however, complains that EPOS' suggestion is too narrow because it excludes Figure 7 of the patent, as well as the equivalents and associated claim language of the structures referenced in Figures 1-5. Instead, Pegasus proposes "structures for

repeatedly and removably affixing the unitary sensor array disclosed in the '461 Patent and equivalents thereof."

The parties agree that this means-plus-function claim invokes Figures 1 through 5 of the patent, each of which describes a specific structure used to attach a sensor array to a substantially planar surface like a whiteboard (i.e., double sided-tape, various hooks, etc.).  The parties disagree, however, on whether the claim language also invokes Figure 7 of the patent.  Pegasus believes that Figure 7 represents a "structure, material, or act[] described in the specification" as a "means for affixing the unitary sensor array," whereas EPOS believes it does not.

Unlike Figures 1-5, which describe specific structures, Figure 7 describes possible locations on the white board (or other substantially planar surface) where a user may attach the array (i.e., along the top, along the side, and along the bottom).  As such, Figure 7 does not describe a specific "structure, material, or act" used to attach the array. Demonstrating that a user may attach the array to the bottom of a vertical planar surface does not explain how the user could do so or what type of structure the user could use for that purpose.  Consequently, the claim term does not invoke Figure 7 of the patent.

Pegasus also complains that EPOS' proposal ignores the associated language and "equivalents" of the structures presented in Figures 1-5.  By statute, however, a means-plus-function claim necessarily includes the equivalents of the structures described in a patent's applicable specifications.  See 35 U.S.C. § 112.  As such, EPOS' proposed construction is technically correct and complete, but it also does little to clarify the meaning of the claim in terms a layperson could easily understand.  The Court will adopt EPOS' suggestion at this stage, but it reserves the right to revisit the issue if necessary before this case is tried before a jury.  Accordingly, this term will be constructed as a "means-plus-function claim with structures disclosed in Figures 1-5."

**8.    "Microswitch." '371, '565 and '742 Patents.**

All three patents in which the term "microswitch" appears involve writing devices that contain ultrasonic transmitters. The transmitters begin transmitting when the marking tip is depressed against a writing surface (described above as pen-down), and they stop transmitting when the marking tip is lifted (pen-up).  The patents refer to the mechanism that detects whether the marking tip is depressed as a "microswitch."

EPOS argues that "microswitch" has a very specific meaning to those skilled in the art.  To that end, EPOS submitted the declaration of Dr. Amit Lal, an expert in the fields of

ultrasonics and small electromechanical devices. EPOS Br. at
12-13.[8] Dr. Lal avers that a microswitch can be only one of two
different types of switches, neither of which looks or works
anything like the structure referred to as a microswitch in
these patents. In turn, EPOS argues that since the patentee did
not mean to refer to either of the two very specific meanings
discussed by Dr. Lal, the patentee must have been acting as his
own lexicographer, in which case the patentee made up his own
definition of "microswitch." When a patentee acts as his own
lexicographer, the definitions of the terms he creates are
confined to however the terms are defined in the patent's
specifications. With one exception, the specifications of the
instant patents refer only to a preferred embodiment wherein the
"microswitch" includes the use of a spring. Consequently, EPOS
argues the term should be construed as "a small switch that
utilizes a spring." Pegasus, on the other hand, submits that
the term should essentially mean a "switch" that is "micro" in
size, which leads them to "a very small switch that is sensitive
to minute motions."

     The claims of these patents do not require the microswitch
to have a spring. Rather, only the preferred embodiments
expressed in the patent specifications refer to a spring. The

---

[8] EPOS' opening claim construction brief will be cited as "EPOS
Br." Pegasus' opening brief will be cited as "Pegasus Br.," and
Pegasus' reply brief will be cited as "Reply."

scope of a patent is defined by the claims, not by the preferred embodiments. Even if the Court accepts that the patentee was acting as his own lexicographer, the definition of the term need not include reference to a spring because the specifications do not preclude embodiments that do not include a spring. For example, patent '742 explicitly refers to a piezoelectric switch that would perform the same function as a spring. '742, 10:3-4. Thus, the microswitch with a spring, as it appears in specifications of all three patents, is merely a preferred embodiment. The language of the claims does not require that the microswitch use a spring, so EPOS' proposal is too narrow. Consequently, the Court will construct the term consistent with Pegasus' suggestion as "a very small switch that is sensitive to minute motions."

**9.**    **"Presentation Board" and "Board."   '371 and '742 Patents.**

The dispute regarding the next claim terms, "presentation board" or "board," involves a question about the type and size of surface for which the patentee created the digitization system. As discussed above, many preferred embodiments contained within the patents at issue contemplate a system to be used with a large board, such as a whiteboard. To that end, some of the inventions enable the use of tracking systems with ever larger boards by, for example, providing a method of

calculating the location of a marker based on data from several receivers installed over a wide board. Previously, tracking systems for use with several receivers spaced over an exceedingly large board were unavailable. Nevertheless, the patent claims make no reference to whiteboards or any other specific writing surface. In addition, some patent specifications contemplate applications of the technology to not only whiteboards, but also to writing surfaces "of all sizes." '371, 2:41. Critically, the patent claims refer only to a "presentation board" or "board."

In light of the specifications' heavy emphasis on whiteboard systems, EPOS submits that the terms are overbroad and that they should be constructed to more closely mirror the patents' preferred embodiments. It also argues that "presentation board" is inherently a board used for a presentation, and that a presentation necessarily requires at least one presenter and an audience. Last, EPOS contends that "board" is merely shorthand for "presentation board," so the Court should impose the same construction for both terms. Hence, EPOS proposes that both terms be constructed as "a board designed for presenting information to multiple people." Pegasus refutes EPOS' position and makes the straightforward argument that the claim language is unambiguous and does not

include any limitations.  As such, Pegasus maintains that the term requires no construction.

Based upon the language of the claims, EPOS' definition is too narrow.  For one example, a presentation may have an audience of only one, so it is improper to suggest the board must be used to present information to "multiple people."  In addition, a statement of intended use—such as the phrase, "designed for presenting information to multiple people"—in claim language is not typically a limitation.  This is an instance where, notwithstanding the fact that many of the patents' preferred embodiments repeatedly demonstrate a tracking system for use with a large presentation board, the plain and ordinary language of the claims is unambiguous and does not import any limitation on the size of the board to be used. Since the specifications do not limit the scope of an unambiguous claim term, the Court will reject EPOS' proposal.

On the other hand, EPOS is correct in its assertion that "board" in these claims is merely shorthand for "presentation board."  This is evident from both the claims and the specifications.  To avoid confusion, the Court will construct "board" as "presentation board," but it will otherwise decline to impose a more narrow construction on "presentation board."

**10.  "Retrofittable Apparatus."  '051 and '461 Patents.**

The next disputed claim term, "retrofittable apparatus," appears in the context of the '051 and '461 patents, which describe generally a sensor array that can be attached to or otherwise used with a pre-existing writing surface. EPOS objects to this term because it is unclear insofar as it may refer either to an apparatus that retrofits something else, or to an apparatus that can be retrofitted by something else. In turn, EPOS proposes "an apparatus that modifies an existing piece of equipment," while Pegasus submits that the term requires no construction.

EPOS' definition improperly limits and further confuses the term with the phrase, "an existing piece of equipment." The claims do not require that the invention be used with an existing piece of equipment and, moreover, the term "equipment" is ambiguous in this context. Nevertheless, the term as it appears in the patents is also ambiguous as explained above, so the Court will construct it as "an apparatus for retrofitting something." This construction will clarify that the term refers to a device that can retrofit something—as opposed to a device that can be retrofitted by something else—while not importing any additional limitations not found in the claim terms.

## 11. "Screen." '371 Patent.

The claims of patent '371 often refer to a device to be used with a "board or screen." The specifications state that

"the present invention can be used for digitizing graphical or textual data drawn on the face of a presentation board and for digitizing annotations with relation to a <u>screen, such as a computer screen.</u>" '371, 7:20-21 (emphasis added). Pegasus argues the meaning of "screen" is self-evident and need not be further construed. It also argues that the words "such as" are synonymous with "for example," and therefore the specification's reference to a computer screen is meant only to inform and not to limit the term. EPOS says the term "screen" is "essentially meaningless" without reference to the specification. EPOS Br. at 21. It also submits that "screen" cannot mean the same thing as "board," since words in a claim should be interpreted to give each term meaning and to avoid redundancy. Since the only reference to a screen in the specifications identifies a computer screen, EPOS argues the term must be constructed narrowly as "a video or computer screen."

The claims do not limit "screen" to a video or computer screen. For example, Pegasus avers that "screen," as used in the claims, could also include a rigid screen in front of a projection. Moreover, Pegasus argues that the use of "screen" is not inconsistent with two of the dictionary definitions for "screen": "a flat surface on which a picture or series of pictures is projected or reflected," and "a surface on which the image appears in an electronic display." Both are plausible but

the former comports more closely with the term's definition as it is used in the claims.  To avoid confusion between the possibly redundant terms "board" and "screen," the Court will construct "screen" as "a flat surface on which a picture or series of pictures is projected or reflected."

## 12. "Substantially planar surface" and "writing surface." '051 and '461 Patents.

Here, again, EPOS argues the Court should import a description of the invention from the specifications to limit otherwise unconstrained claim terms.  To align the terms with the specifications, EPOS proposes constructing them as "a fixed surface (such as a mounted whiteboard or table)."  The specifications, however, refer only to a preferred embodiment and do not limit the scope of the invention.  The terms as they appear in the claims are unambiguous, and the Court will decline to impose a more narrow construction.

## 13. "Transparent ultrasonic receiver and transmitter device." '371 Patent.

As discussed above, the '371 patent teaches a tracking system for use with a pen-like writing device.  Because the tracking system operates by calculating TOF measurements between the ultrasound transmitter located on the writing device and the ultrasound receivers mounted on the writing surface, the system technically tracks the location of the writing device's

ultrasonic transmitter, and not necessarily the writing device's
writing tip.  For example, if the transmitter is located at the
top of the pen, the system would track the movement of the top
of the pen instead of the pen's writing tip.  To increase the
system's accuracy, the patentee devised a pen that included a
transmitter that completely surrounded the pen's writing tip.
The transmitter, however, obscured the pen tip from the user's
view and made the device difficult to use.  To solve this
problem, the patent calls for a "transparent ultrasonic
transmitter or receiver device" near the pen tip.  By making the
pen-tip transmitter transparent, the tracking system retains its
accuracy while allowing the user to see the tip of the pen.  The
dispute here involves the meaning of "transparent."

     Pegasus argues that the patent details a transmitter device
that is "essentially transparent to both ultrasound and light."
Pegaus Br. at 11.  In that sense, the device would need to
"convey" ultrasonic signals because such signals would need to
pass through the device in order to be transmitted or received.
Thus, Pegasus advocates a construction of "a device that is
designed to (i) convey light without appreciable scattering and
(ii) transmit, receive, or convey ultrasonic signal(s)."  In the
alternative, Pegasus agreed in its Reply that it would accept
the term as it appears in the claim.

EPOS, however, takes specific issue with "or convey" in Pegasus' construction. It argues that the term is vague and would capture almost any device that allows ultrasonic signals to pass through it, including an otherwise opaque device. This may include, for example, a device with an ultrasonic transmitter located apart from the transparent pen tip within an opaque portion of the pen's housing. Instead, EPOS suggests "an ultrasonic receiver or transmitter made from transparent ultrasonic polymer," because the specifications explicitly note that transparent piezoelectric polymers are known in the art.

In light of the claims and specifications, Pegasus' proposed language appears overbroad. As EPOS argues, the words "or convey" are unnecessary and expand the scope of the claim. Yet, EPOS' construction is also insufficient. The claim language calls for a transmitter device that is transparent, but it does not specify that the device must be made of a "transparent ultrasonic polymer." Although the specifications note that transparent polymers are a known means of creating transparent transmitters, neither the claims nor the specifications require that the transmitters be made of such polymers. Moreover, counsel at the Markman hearing averred that a person of ordinary skill in the art would be aware of a design for a transparent ultrasonic transmitter that did not require the use of transparent piezoelectric polymers. Thus, for this

term, the Court finds that the plain and ordinary meaning of the claim language is unambiguous and of sufficient clarity, so the Court will not construct it further.

**14.** **"Ultrasound receiver assembly" and "receiver assembly." '742 Patent.**

The final disputed terms appear in the '742 patent. They are "ultrasound receiver assembly" and "receiver assembly." Patent '742 contemplates primarily an ultrasound transmitter device for use with a stand-alone writing utensil similar to a dry-erase marker. Separately, however, the patent also describes a preferred design for an "ultrasound receiver assembly" consisting of two receivers stacked on top of each other to increase the assembly's accuracy. The definition of this assembly is in dispute.

EPOS suggests that the terms be defined as "two ultrasound receivers connected so as to generate a total output signal corresponding to the instantaneous sum of the ultrasound signals received at each of the first and second ultrasound receivers." This is exactly the language used in the specification to describe the preferred embodiment for a more accurate receiver assembly. Thus, EPOS argues the claim terms refer specifically to that two-receiver assembly. On the other hand, Pegasus argues the plain and ordinary meaning of the terms is unambiguous. Pegasus also argues that the two-receiver assembly

described by EPOS is a very common design for a receiver assembly, which is also "one of the simplest if not the simplest available receiver assembl[y]." Pegasus Br. at 20. Given the design's simplicity, Pegasus argues the patentee "could not have reasonably intended to limit the scope of [its] invention" to something so basic. Pegasus Br. at 20.

Here, too, EPOS' construction is too narrow, because nothing in the claim requires the use of the preferred two-receiver assembly. Rather, the specifications discuss "a preferred design," which "may be used" with the invention. '742, 7:9-13. The specification discloses a preferred embodiment, but the embodiment does not limit the scope of the claim. Thus, the Court will decline to construct the term beyond its plain and ordinary meaning.

## V.    CONCLUSION

For the foregoing reasons, the Court will construct the disputed terms as set forth above. The Court will issue a separate order to that end.

_____/s/_____
William M. Nickerson
Senior United States District Judge

August 9, 2011.