IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EPOS TECHNOLOGIES LTD., et al.       *
                                     *
            v.                       *       Civil Action WMN-07-416
                                     *
PEGASUS TECHNOLOGIES LTD., et al.    *
                                     *
                                     *
     *     *     *     *     *     *     *     *     *     *     *     *

MEMORANDUM

The central question in this long-running litigation is whether digital pens manufactured by Plaintiff, EPOS Technologies Ltd., infringe six patents held by Defendants, Pegasus Technologies Ltd, and Luidia, Inc.  The parties have filed cross motions for summary judgment, ECF Nos. 167 (Pegasus & Luidia) & 169 (EPOS), and after considering the parties' briefing, as well as the pleadings, facts and applicable law, the Court determines that the EPOS pens do not infringe any of the claims asserted by Pegasus.[1]  The Court will, therefore, grant EPOS's motion for summary judgment in part, and deny Pegasus's motion for partial summary judgment as moot.[2]

---

[1] The Court also determines that no hearing on the present motions is necessary. LCvR 7(f).

[2] Also pending is a motion to strike the Declaration of Michael Sidman which was submitted in support of Pegasus's motion for partial summary judgment, ECF No. 188.  EPOS argues that (1) Dr. Sidman is unqualified to testify to the issues of infringement and validity in this case, (2) that Dr. Sidman's opinions which contradict the Court's claim construction should be stricken, (3) that Dr. Sidman cannot contradict his deposition testimony,

I.    **FACTUAL AND PROCEDURAL BACKGROUND**

Both EPOS and Pegasus develop and market digital pens.  In 2007, after Pegasus sent letters to EPOS as well as EPOS's investors and business partners claiming that EPOS's products infringed four patents, EPOS filed suit seeking a declaration of noninfringement or a determination of invalidity on the same four patents.  See ECF No. 1 (Complaint).  After unsuccessfully moving to dismiss EPOS's Complaint, see ECF Nos. 25 & 26 (Mem. & Order), Pegasus answered and asserted counterclaims.  ECF No. 31 (Answer & Counterclaims).  In addition to the four patents identified in EPOS's Complaint, Pegasus sought damages and injunctive relief for infringement based on two other patents.  Pegasus's counterclaims also added Luidia, Inc. (Luidia) as counterclaim plaintiff and Dane-Elec S.A., Dane-Elec Memory S.A., and Dane-Elec Corporation USA (collectively Dane-Elec),[3] as counterclaim defendants.

---

and (4) that certain of his opinions are conclusory and lack foundation.  For the purpose of ruling on the present motions for summary judgment, the Court will deny EPOS's motion.  Many of EPOS's arguments overlap with arguments advanced in its summary judgment briefing where the Court has addressed them as needed.

In addition, there are several motions pending, by all parties, for leave to file documents under seal, none of which have been opposed.  For good cause shown, the Court will grant all of them: ECF Nos. 166, 173, 176, 178, 185, 186, 189, 196 & 201.

[3] Dane-Elec Memory, S.A., is a company organized under the laws of France of which Dane-Elec Corporation USA is a wholly-owned

In total, there are six patents-in-suit: U.S. Patent Nos. 6,724,371 entitled "Presentation Board Digitizers", 6,841,742 entitled "Presentation Board Digitizer Systems," 6,326,565 entitled "Marking Device for Electronic Presentation Board," 6,392,330 entitled "Cylindrical Ultrasound Receivers and Transceivers Formed from Piezoelectric Film," 6,501,461 entitled "Retrofittable Apparatus for Converting a Substantially Planar Surface into an Electronic Data Capture Device," and 6,266,051, which shares the same title as the '461 patent.  In addition, there are three EPOS products at issue, the Zpen, which has been sold in the United States by Dane-Elec, the Gpen300, and the Intellipen.  Collectively, the Zpen, Gpen300, and Intellipen are referred to as "the EPOS Products."

In 2011, the Court held a _Markman_ hearing to construe numerous terms appearing in the patents-in-suit that were either allegedly indefinite, or the meaning of which was disputed by the parties.  The Court issued a _Markman_ Order construing 14 such terms.  ECF No. 91.

---

subsidiary.  ECF No. 48 ¶¶ 5,8.  It imports, markets, and sells ultrasonic digital pens including the ZPen, one of the accused products in this litigation.  ECF No. 48 ¶ 9.  Dane Elec has not joined in EPOS's Motion for Summary Judgment.  Nonetheless, because the Court finds that none of the accused products infringe the claims asserted by Pegasus, the Court will enter judgment in Dane-Elec's favor.

## II.  LEGAL STANDARDS[4]

Summary judgment is available, and appropriate, in a patent infringement case just as it is in any other type of civil litigation.  See SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1116 (Fed. Cir. 1985).  There must, however, be no genuine dispute of material fact and the moving party must establish that it is entitled to judgment as a matter of law. Id.; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Here, Pegasus has the burden of proving infringement at trial.  Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1573 (Fed. Cir. 1994) ("patentee must prove that the accused device embodies every limitation in the claim, either literally or by a substantial equivalent" by a preponderance of the evidence). Therefore, EPOS is entitled to summary judgment if it can show that (1) there is no dispute as to any material fact, and (2) Pegasus "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof."  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

---

[4] EPOS moved for summary judgment both on the ground that its products do not infringe the patents-in-suit as well as invalidity of the patents-in-suit.  The legal standards which govern these two issues are substantially different.  Because the Court will grant summary judgment on the issue of infringement, however, it will forego an explanation of the standards governing issues of validity.

Establishing infringement is a two-step process which involves (1) claim construction, and (2) comparing the accused instrument to the construed claims.  Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995)(en banc), aff'd, 517 U.S. 370 (1996).  The first inquiry, claim construction, is a matter of law and summary judgment is particularly appropriate where the "determination of infringement turns solely on the legal question of the proper construction of the claims."  Mantech Envtl. Corp. v. Hudson Envtl. Servs, Inc., 152 F.3d 1368, 1371 (Fed. Cir. 1998).

The second step requires the patentee to establish that the accused product meets every limitation of the patents' claims, literally or by their substantial equivalent.  Conroy, 14 F.3d at 1573; PC Connector Solutions LLC v. SmartDisk Corp., 406 F.3d 1359, 1364 (Fed. Cir. 2005).  If even a single limitation is not met by the accused device, there is, as a matter of law, no infringement.  Digital Biometrics, Inc. v. Identix, Inc., 149 F.3d 1335, 1349 (Fed. Cir. 1998).

Literal infringement exists when each limitation of the claim is found in the accused device.  Amhil Enters., Ltd. v. Wawa, Inc., 81 F.3d 1554, 1562 (Fed. Cir. 1996).  By contrast, "infringement under the doctrine of equivalents occurs when a claimed limitation and the accused product perform substantially the same function in substantially the same way to obtain

substantially the same result." <u>V-Formation, Inc. v. Benetton Group SpA</u>, 401 F.3d 1307, 1313 (Fed. Cir. 2005) (citing <u>Warner-Jenkinson Co. v. Hilton-Davis Chem. Co.</u>, 520 U.S. 17, 40 (1997)).  Findings of infringement under the doctrine of equivalents is, however, the exception and not the rule.  <u>London v. Carson Pirie Scott & Co.</u>, 946 F.2d 1534, 1538 (Fed. Cir. 1991).  As the court in <u>London</u> explained, this is because if "the doctrine of equivalents is simply the second prong of every infringement charge, regularly available to extend protection beyond the scope of the claims, then claims will cease to serve their intended purpose."  <u>Id.</u>

## III. DISCUSSION

### A.  The EPOS Products Do Not Infringe The '565 Patent

Claim 1 of the '565 Patent reads:

A transmitter device for use with a system for digitizing operative strokes of a handheld drawing implement, the drawing implement having a body and an operative tip, the transmitter device comprising:
    A housing;

    A transmitter mounted relative to said housing;

    A microswitch that is responsive to a force exerted on the operative tip of the drawing implement towards said housing;

    Electronic circuitry responsive to said microswitch to affect operation of said transmitter, wherein said electronic circuitry operates said transmitter for a given time interval after said microswitch ceases to indicate a force exerted on said housing towards the operative tip of the drawing implement.

All of the claims in the '565 Patent depend on Claim 1.  EPOS argues that it is entitled to summary judgment because its products do not have a "drawing implement" and do not operate for a "given time interval" as those terms have been construed by the Court.

### 1. The EPOS Products Do Not Use "Drawing Implement[s]"

The EPOS Products use pen refill cartridges and the parties dispute whether such cartridges meet the Court's construction of the term "drawing implement."  The Court construed "drawing implement" as "a conventional writing utensil that can be used alone or together with the invention."  ECF No. 91.

EPOS argues that the cartridges do not qualify as "drawing implement[s]" because the refills are not intended to be used on their own and are not conventionally used as writing utensils. EPOS Mem. at 10.  Pegasus responds by focusing on the phrase "can be used alone" in the Court's construction.  It argues that the refill cartridges meet the Court's construction because they can be used alone as demonstrated by EPOS's chief technical officer, Nathan Altman, at his deposition.[5]  Pegasus Opp'n at 16-17.

EPOS prevails on this issue because, as the Court interprets it, Pegasus's position is nothing more than an

---

[5] Mr. Altman wrote his name and drew a smiley face.  Altman Dep. 453:14-455:7.

attempt to reargue the Court's claim construction. Specifically, it seeks to avoid the requirement that the "drawing implement" be a "conventional writing utensil."  ECF No. 91 (emphasis added).  It is clear that Pegasus is advancing – and relying on - the construction it would have preferred. During the claim construction proceedings, Pegasus argued that "'drawing implement' should not be limited to a 'pen or marker' and especially not 'conventional' or 'stand-alone' types."  ECF No. 58 at 24 (emphasis added).  Pegasus's present focus on one's ability to write with a refill cartridge is analogous to its argument during claim construction that because "a stubby No. 2 pencil [or] charcoal" can be used alone, they are drawing implements. Id. at 23.  The Court declined to adopt Pegasus's argument then and it will not revisit its construction of this term now.  Because the Court concludes that no reasonable jury could find that pen refills used in the EPOS Products are "drawing implement[s]" as that term has been construed, EPOS is entitled to summary judgment.

## 2. The EPOS Products Do Not Operate for a "Given Time Interval" After Being Lifted From the Writing Surface

EPOS also argues that it is entitled to summary judgment on the '565 Patent because its products do not operate for a "given time interval" after being lifted from the writing surface.  The Court construed "given time interval" to mean "fixed at a few

8

seconds or less." ECF No. 91.  It is undisputed that the EPOS

Products operate for 25 seconds after they cease to detect any

input, whether that input comes from contact between the pen's

tip and a writing surface or the user's toggling other buttons

on the device.  Altman Decl. ¶¶ 21-23, 25.  Pegasus argues that

the EPOS Products literally infringe the '565 Patent because 25

seconds is a "given time interval" and, to the extent it is not

under the Court's construction, Pegasus submits that the

construction is incorrect.  Pegasus Opp'n at 19 (citing Sidman

Decl. ¶ 20).  The Court has already thoroughly explained its

construction of this term and has made clear that while it was

expanding the term beyond the preference stated in the

specifications of the patent (i.e., "between 1 and about 2

seconds" '565, 5:3), it was doing so only "slightly."  ECF No.

90 at 18.  EPOS is entitled to summary judgment on Pegasus's

allegation of literal infringement because Pegasus's argument

only attacks the Court's claim construction and because no

reasonable jury could return a verdict for Pegasus based on that

construction.

Alternatively, Pegasus contends that the EPOS Products meet

the "given time interval" limitation of Claim 1 under the

doctrine of equivalents.  As noted above, "[i]nfringement under

the doctrine of equivalents occurs when a claimed limitation and

the accused product perform substantially the same function in

substantially the same way to obtain substantially the same result." V-Formation, Inc., 401 F.3d at 1313.  Pegasus essentially ignores this inquiry[6] and argues that, even though the EPOS Products operate for 25 seconds after input is detected, they infringe under the doctrine of equivalents because 25 seconds includes a "given time interval."  Pegasus Opp'n at 20 (citing Sidman Decl. ¶ 22).  Pegasus's position is untenable because it would eliminate the limitation as construed by the Court entirely.  See Planet Bingo, LLC v. GameTech Int'l, Inc., 472 F.3d 1338, 1344 (Fed. Cir. 2006) (citing Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 29 (1997)).  Therefore, EPOS is also entitled to summary judgment on Pegssus's allegation of infringement under the doctrine of equivalents.

**B.  The EPOS Products Do Not Infringe The '742 Patent**

Pegasus has alleged infringement of Claims 2 through 8 of the '742 Patent.  All of them require use of a "drawing

---

[6] The undisputed facts show that there is no infringement under the doctrine of equivalents.  First, the time-out circuit on the EPOS Products is intended to allow the pen to turn on and off without the need for an on/off switch, Altman Decl. ¶ 23, while the time-out circuit taught by the patent operates for a "given time interval" so as to allow the user to draw dashed lines without losing any data as a result of necessary resynchronization.  '565, 4:42-5:4.  In addition, the circuit on the EPOS Products operates in a substantially different manner than the one taught by the patent; the circuits in the EPOS Products continue to operate after the pen is lifted from the writing surface if the user toggles one of its other buttons. Altman Decl. ¶¶ 22, 25.

implement."  In addition, Claim 5 requires a transmitter which operates for a "given time interval after [ceasing] to indicate force exerted on the outer housing towards the operative tip [of the drawing implement]."  '742, 14:38-40.  The terms "drawing implement" and "given time interval" as they appear in the '742 Patent were given the same construction as they were given in the '565 Patent.  ECF No. 91.  Therefore, EPOS is entitled to summary judgment on all of Pegasus's claims under the '742 Patent.

## C.  The EPOS Products Do Not Infringe The '371 Patent

All of the claims in the '371 Patent require "an ultrasonic receiver or transmitter device ... for receiving or transmitting an intermittent ultrasound signal."  See, e.g., '361, 22:29-33, 50-52. EPOS argues that it is entitled to summary judgment on Pegasus' allegations of infringement because its products transmit a continuous ultrasound signal.

The term "intermittent" has not previously been construed by the Court and both parties advance construction arguments in their briefing here.  The Court finds much of the parties' argument unnecessary because the term "intermittent" is unambiguous.  "[W]ords in patent claims are given their ordinary meaning in the usage of the field of the invention, unless the text of the patent makes clear that a word was used with a special meaning."  Toro Co. v. White Consol. Indus., Inc., 199

F.3d 1295, 1299 (Fed. Cir. 1999).  Neither party has suggested, nor does the text of the patent reveal, that the word "intermittent" was used with any special meaning.  Therefore, with one caveat, the Court will construe "intermittent" as Pegasus has suggested - "something that 'occurs occasionally, in a non-continuous manner, in a random or unpredictable manner, or at selected times.'" Pegasus Opp'n at 22 (quoting Steven M. Kaplan, Wiley Electrical and Electronics Engineering Dictionary 383 (2004)).[7]

Pegasus takes the position that the term should cover any instance when the device is in the user's possession and not just when the user is actively using the pen.  Its stance is best illustrated by its argument with regard to the EPOS Products.  Pegasus suggests that

> [t]he EPOS pens transmit an intermittent signal because the pens are specifically designed to begin transmitting ultrasound when the user presses the pen tip to the paper and to cease transmitting ultrasound after the pen times out.  As a result, the EPOS products transmit ultrasound intermittently because they are only transmitting at times when the user is actively using the pen.

---

[7] This definition of "intermittent" is also found outside of the technical realm.  EPOS cites Merriam Webster's Collegiate Dictionary which defines "intermittent" as "coming and going at intervals: not continuous."  EPOS Mem. at 13; see also The American Heritage Dictionary of the English Language, 4th ed. (2000) ("stopping and starting at intervals"); Collins English Dictionary (2003) ("occurring occasionally or at regular or irregular intervals; periodic").

Pegasus Opp'n at 22 (internal citations omitted). Pegasus's argument borders on the absurd. Accepting it would mean that any device utilizing any form of ultrasound to transmit data would meet this limitation. Such a construction would render the term "intermittent" meaningless and be contrary to the Patent Act's requirement that claims "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112(b); see also Curtiss-Wright Flow Control Corp. v. Velan, Inc., 438 F.3d 1374, 1379 (Fed. Cir. 2006) (reversing where district court's construction of "adjustable" covered "almost any mechanical device" and gave no consideration to "time, place, manner or means of adjustment"). As a result, the Court construes "intermittent" to refer only to those times when the user is actively using the device.

Given this construction, it is clear that EPOS is entitled to summary judgment on Pegasus's claim of literal infringement because it is undisputed that the EPOS Products generate a continuous ultrasound signal. Altman Decl. ¶ 13. In addition, it is clear that EPOS is entitled to summary judgment on Pegasus's claim of infringement under the doctrine of equivalents. Pegasus's suggestion that the "intermittent ultrasound signal" taught by the '371 Patent and the EPOS

Products' "continuous ultrasound signal" are equivalents would eliminate the intermittent limitation entirely.  As noted above, the doctrine of equivalents cannot extend that far.  Planet Bingo, LLC, 472 F.3d at 1344; Warner-Jenkinson Co., 520 U.S. at 29.  Therefore, the Court will grant EPOS's motion for summary judgment as it relates to Pegasus's allegations of infringement on the '371 Patent.

**D.  The EPOS Products Do Not Infringe The '330 Patent**

Pegasus has alleged that the EPOS Products infringe Claims 16-18 of the '330 Patent.  All of the asserted claims require "a method for providing mechanical protection for an ultrasound transducer used for given frequency of ultrasound signals while minimizing interference with the ultrasound signals."  '330, 12:29-32.  EPOS argues that its products do not infringe any of the asserted claims because they do not transmit ultrasound signals at a "given frequency," but rather transmit across a spectrum from approximately 25 kHz to 78 kHz.  EPOS Mem. at 19.

The Court has not construed the term "given frequency." The parties dispute whether a "given frequency" must be a specific frequency or can be a range of frequencies.  The Court finds that construing "given frequency" as "a specific frequency" is appropriate because it is consistent with the claim language and with the Patent's specifications.  The claims make clear that the "given frequency" is used to determine the

position and construction of guards around the transducer.

'330, 12:32-40.  The guards are set at fixed distances which

depend on the wavelength of "the given frequency."  Id.  As

EPOS notes, if "given frequency" did not mean "a specific

frequency" the claims would not offer any guidance for spacing

the guards.  The specifications also treat "given frequency" as

"a single frequency."  See '330, 9:33-37 ("for a working

frequency of 90 kHz, corresponding to a wavelength in air of

about 4 mm, a grating step of 1.9 mm has been found to offer

minimal disruption to the transmission and reception of

signals").

It is undisputed that the EPOS Products operate across

multiple frequencies.  See Altman Decl. ¶ 12; Schafer Decl. ¶¶

22-23; Ex. K to Sidman Report at 13.  Thus, the EPOS Products do

not operate at a "given frequency" as that term has been

construed by the Court.

**E.  The EPOS Products Do Not Infringe The '461 Patent**

Claim 1 of the '461 Patent reads:

A retrofittable apparatus for converting a
substantially planar surface into a writing surface
for an electronic data capture device, the apparatus
comprising;
        A unitary sensor array that securely and rigidly
        fixes a relation between a plurality of sensors
        and that provides a tracking function to
        determine the position of a marking implement on
        the writing surface; and

> A means for affixing the unitary sensor array to
> the substantially planar surface.

'461, 9:42-50.  All of the asserted claims depend on Claim 1.

EPOS argues that it is entitled to summary judgment because its

products do not use a "marking implement."  The Court has

construed the term "marking implement" as used in the '461

Patent to mean "an implement that has a marker tip (and not a

pen tip)."  ECF No. 91.  Pegasus's only argument in opposition

is that the Court's construction of "marking implement" is

incorrect.  Again, the Court will not revisit its construction

of this term, and the opinions of Pegasus's expert, which rely

on a contrary construction, are insufficient to generate a

dispute of material fact.  LP Matthews, LLC v. Bath & Body

Works, Inc., 458 F. Supp. 2d 198, 2010 (D. Del. 2006); ICU Med.,

Inc. v. Alaris Med. Sys., 2007 U.S. Dist. LEXIS 13156, *42-44

(C.D. Cal. Jan. 22, 2007).

Pegasus also raises an argument for infringement under the

doctrine of equivalents.  By doing so, Pegasus essentially seeks

to extend the Patent to cover that which has been expressly

excluded by the Court's construction – an implement that has a

pen tip.  As noted repeatedly throughout this opinion already,

the doctrine of equivalents cannot extend so far as to eliminate

the claim limitation – "not a pen tip" - entirely.  The Court

16

will therefore grant summary judgment in EPOS's favor in

Pegasus's allegations of infringement of the '461 Patent.

**F.  The EPOS Products Do Not Infringe The '051 Patent**

Both of the asserted claims in the '051 Patent depend on

Claim 1 which reads:

> A retrofittable apparatus adapted for converting a
> substantially planar surface into a writing surface
> for an electronic data capture device, comprising:
>> A sensor array including at least two sensors
>> that are fixedly mounted within a single housing
>> to establish a fixed relationship between said at
>> least two sensors;
>>
>> Said sensor array providing a tracking function
>> to determine the position of an implement on said
>> writing surface; and
>>
>> A temporary attachment for removably affixing
>> said sensor array proximate to said substantially
>> planar surface.

'051, 10:2-11.  EPOS argues that its products do not infringe

the '051 Patent because they do not contain "a temporary

attachment."

The parties dispute the meaning of "temporary attachment."

EPOS argues that "temporary attachment" refers to the mechanism

that is used to connect the "retrofittable apparatus" or "sensor

array" to the "substantially planar surface."  EPOS Mem. at 36-

38.  Pegasus counters by arguing that "'temporary attachment'

refers to the ability to temporarily attach the base station to

the paper, not to attach the clip to the receiver."  Pegasus

Opp'n at 42.  It suggests that summary judgment should be denied

because there are "outstanding issues of material fact" namely, "whether 'temporary attachment' means that the device is temporarily attached to the surface, or that the attachment is temporarily attached to the device." Id.

Contrary to Pegasus's assertion, the meaning of "temporary attachment" is a question of law appropriate for determination by the Court. See, e.g., Hebert v. Lisle Corp., 99 F.3d 1109, 1117 (Fed. Cir. 1996) ("any dispute as to the meaning of claim terms is the province of the court, not the jury"). Moreover, the Court finds Pegasus's suggested construction unsupportable for several reasons. First, the plain language of Claim 1 dictates that the "retrofittable apparatus" which is used for converting the "substantially planar surface" into "an electronic data capture device" must contain "a temporary attachment." Second, this reading is clearly supported by the Patent's specifications. Figure 1 in the Patent illustrates the "retrofittable apparatus" described in Claim 1 with attachments which are removable from the "retrofittable apparatus."[8] Third, Pegasus' own expert identified the clip on the EPOS Products' sensor, used to affix the sensor to the writing surface, as the

---

[8] Figures 2 through 4 are to the same effect. In particular, Figure 2 illustrates a preferred method whereby the sensor array is attached to the writing surface by "double stick mounting tape." '051, 5:51-54. The Court understands it to be common knowledge that double stick tape can be removed from items affixed to both of its sides; in this case, the sensor array and the wall or writing surface.

"temporary attachment," see Sidman Rpt., Ex. I at 3, which is consistent with Pegasus's infringement contentions.  See Infringement Contentions at 19.  Fourth, "claims are interpreted with an eye toward giving effect to all terms in the claim," Bicon, Inc. v. Straumann Co., 441 F.3d 945, 950 (Fed. Cir. 2006), and should not be construed so as to render terms redundant or superfluous.  See id.; Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc., 214 F.3d 1302, 1307 (Fed. Cir. 2000)(reversing where court's construction rendered term superfluous); Messagephone, Inc. v. SVI Sys., Inc., 243 F.3d 556 (Fed. Cir. 2000)(reversing where construction rendered term "redundant, by giving both terms the same meaning").  Adopting Pegasus's construction of "temporary attachment" would fall into just such a trap because it would be given the same meaning as the later term "for removably affixing."  Therefore, the Court will construe "temporary attachment" as an element that can be removed from the device's "retrofittable apparatus."

In light of this construction, EPOS is entitled to summary judgment.  It is undisputed that the EPOS Products use receiver units equipped with spring loaded clips to grasp pieces or pads of paper, and that those clips are permanently attached to the receiver units.  Altman Decl. ¶¶ 142-43.  Thus, the EPOS Products do not infringe the '051 Patent because they do not meet the "temporary attachment" limitation of Claim 1.

### G.  The Court Will Not Consider EPOS's Claims of Invalidity

EPOS has also argued that certain of the patents or asserted claims of the patents are invalid.  In light of the foregoing finding that none of the patents are infringed by the EPOS Products, the Court will exercise its discretion to (1) decline to consider EPOS's arguments on the issue of validity, and (2) dismiss EPOS's claims for declarations of invalidity on the ground that they are moot.  Nestier Corp. v. Menasha Corp.- Lewisystems Div., 739 F.2d 1576, 1581 (Fed. Cir. 1984) (where the patent "was judged to have been not infringed . . .  to then adjudge the patent valid would be to decide an unnecessary question as between these parties."); Phonometrics, Inc. v. N. Telecom Inc., 133 F.3d 1459, 1468 (Fed. Cir. 1998)("a district court has discretion to dismiss a counterclaim alleging that a patent is invalid as moot where it finds no infringement"); Angelo Mongiello's Children, LLC v. Pizza Hut, Inc., 70 F. Supp. 2d 196, 208 (E.D.N.Y. 1999)(declining to address summary judgment motion as it related to invalidity after determining that there was no infringement).  Counts V through VIII of EPOS's Complaint, ECF No. 1, will be dismissed without prejudice and, as a result, Pegasus and Luidia's Motion for Partial Summary Judgment of No Inequitable Conduct will be denied as moot.

**IV.   CONCLUSION**

For the foregoing reasons, EPOS's motion for summary judgment will be granted in part, Counts V through VIII of EPOS's Complaint will be dismissed without prejudice, Pegasus's motion for partial summary judgment will be denied as moot, and EPOS's motion to strike the affidavit of Michael Sidman will be denied.   A separate order will issue.


                                                 /s/
                               _____
                               William M. Nickerson
                               Senior United States District Judge


DATED: January 9, 2013